UNITED STATES, Appellee,

v.

Keith J. BIAGASE, Lance Corporal, U.S. Marine Corps, Appellant.

No. 98–0152.
Crim.App. No. 96–1459.

U.S. Court of Appeals for the Armed Forces.

Argued Sept. 16, 1998.

Decided April 13, 1999.

Sullivan, J., filed opinion concurring in the result.

GIERKE, J., delivered the opinion of the Court, in which COX, C.J., and CRAWFORD and EFFRON, JJ., joined. SULLIVAN, J., filed an opinion concurring in the result.

For Appellant: *Major Dale E. Anderson,* USMC (argued).

For Appellee: *Lieutenant Russell J.E. Verby,* JAGC, USNR (argued); *Commander D.H. Myers,* JAGC, USN (on brief); *Colonel Charles Wm. Dorman,* USMC.

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of attempted robbery (2 specifications), conspiracy to commit robbery (2 specifications), robbery (3 specifications), and assault consummated by a bat-

tery, in violation of Articles 80, 81, 122, and 128, Uniform Code of Military Justice, 10 USC §§ 880, 881, 922, and 928, respectively. The court-martial sentenced appellant to a bad-conduct discharge, confinement for 15 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence but suspended confinement in excess of 7 years for 4 years from the date of his action. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion.

This Court granted review of the following issue: [1]

WHETHER THE EXERCISE OF UNLAWFUL COMMAND INFLUENCE DEPRIVED APPELLANT OF A FAIR TRIAL.

For the reasons set out below, we resolve the granted issue against appellant.

*Factual Background*

Appellant was apprehended as one of several suspects in a series of beatings and robberies. He was interviewed by agents of the Naval Criminal Investigative Service (NCIS), and he gave them a detailed confession admitting his involvement in one of the incidents. In his confession, he admitted conspiring with a group of fellow Marines to "jack people ... because it sounded fun." He defined the term "jack" as follows:

When I say "jack people" I mean that we beat them up, kick them or whatever we have to do until they are hurt pretty bad and do not resist us any more. After the people are down, laying on the ground and cannot resist because we hurt them, we take their money or whatever else we want to take.

Appellant admitted being one of a group of seven black Marines who surrounded four "white guys" and "jacked" them.

At his court-martial, appellant made a timely motion to dismiss all charges and specifications on the grounds of unlawful command influence. His defense counsel as-

---

1. We heard oral argument in this case at the United States Naval War College, Newport, Rhode Island, as part of "Project Outreach." *See Allen,* 34 MJ 228, 229 n. 1 (CMA 1992).

serted that, shortly after appellant confessed, copies of his confession were circulated within his unit, and references were made to his confession in unit formations. The defense asserted that the actions by appellant's command had a chilling effect on potential defense witnesses that made a fair trial impossible. The defense further asserted that the potential witnesses could testify to appellant's good military character. The defense did not assert that any substantive witnesses, *i.e.*, eyewitnesses to the incident, were deterred from testifying.

In support of the motion to dismiss, two witnesses were called by the defense. Staff Sergeant (SSgt) Lawson, the noncommissioned officer-in-charge (NCOIC) of appellant's duty section, testified that he learned about the "jacking" incident on the Monday after it happened. He was "pretty distraught—overwhelmed," and "couldn't really believe that it happened." He felt that it was his fault that one of his Marines was in trouble. He visited the senior NCO in the company, First Sergeant (1stSgt) Bressler, who "consoled" him and "tried to convey to [him] that it wasn't really [his] fault." The first sergeant told SSgt Lawson that he wanted him to hold a formation and "let the Marines know that Marines don't do these types of things." The first sergeant gave him a copy of appellant's confession.

SSgt Lawson testified that his section, the bulk storage section, had a formation every Tuesday. As platoon sergeant, he ordinarily held the formation. Because of "the magnitude of this incident," he asked Master Sergeant (MSgt) Stanton, the senior staff NCOIC, to discuss the incident. SSgt Lawson was not present when MSgt Stanton talked about it.

SSgt Lawson testified that no one tried to intimidate him or prevent him from testifying for appellant. He testified:

I never thought that it would affect my career—in any way, shape, or form affect my career. But perhaps it would affect the way people—some people thought of me as a person and as a staff NCO. Even though they would have never said it or would have affected my career on paper, but just the way people thought of me.

SSgt Lawson was asked if his officer-in-charge (OIC), Chief Warrant Officer (CWO) Harris, had made any comments about appellant. He testified that CWO Harris did not know appellant, but based solely on the statement, he thought that she would consider him a "thug or a punk."

LCpl Calloway testified that he worked with appellant, and that appellant had taught him how to do his job in the hazardous materials section. LCpl Calloway testified that, immediately after appellant was placed in pretrial confinement, "people from privates all the way up to staff NCOs" began to talk about what had happened. LCpl Calloway testified that 1stSgt Bressler talked about appellant's confession at a unit formation, quoting from the statement with words like "jack," "beat down," and "robbed," and telling the Marines, "I'm not going to tolerate this kind of stuff."

LCpl Calloway testified that he was reluctant to testify when first approached by defense counsel, because he thought that if he helped appellant, "it might be harder for me here." During direct examination, he did not elaborate on the basis for his reluctance.

On cross-examination, LCpl Calloway testified that he already knew appellant was "in trouble" when he attended the formation at which the "jacking" incident was discussed. He testified that no one threatened any repercussions if he testified. When asked to explain why he was initially reluctant to testify, he testified that he thought "maybe [his] leave might be cancelled or, you know, someone might say, well, he did that so, you know—and something of that matter." He testified that some members of the section read appellant's statement and decided not to help him, believing that "he gets what he deserves." He testified that most of the Marines in his section "don't want to have anything with it just because of the way the statement was read out and the things they read." He testified, "[H]alf the people that work in my section, they wouldn't have anything to do with it."

LCpl Calloway testified that someone in his shop had a copy of appellant's statement, and it was discussed by most of the 90 people in the shop. He described their reaction to appellant's statement as follows:

And it was like they were upset because they knew that he couldn't say anything, you know—he wouldn't say anything like that. And even if he did, it was so dismal for him just to turn himself in and then say what he said, you know. It made them upset. And then you had other people who don't know him who really believe he did all that stuff, and it's weird. It's messed up.

On examination by the military judge, LCpl Calloway testified that those who did not know appellant before the incident did not want anything to do with him, but those who knew appellant and had favorable opinions were willing to come forward. LCpl Calloway testified that, when the statement was disclosed, he felt that "the command" would look unfavorably on those who were trying to help appellant. He explained that, when he said "the command," he meant "Top Stanton, maybe the First Sergeant, the Captain, Chief Warrant Officer Harris." He explained further that he thought the command might disapprove of testifying for appellant because the command had talked about "how stupid it was and how racial and violent it was," causing LCpl Calloway to think that, if he tried to help appellant, the command might think that he "just want[s] to be like him." Notwithstanding his initial reluctance, LCpl Calloway told the military judge that, if he testified for appellant, he was not concerned that his command would rate him less favorably or make it hard on him.

After LCpl Calloway and SSgt Lawson testified, the military judge *sua sponte* directed that Captain (Capt) Fuhs, 1stSgt Bressler, MSgt Stanton, and CWO Harris be produced to testify.

Capt Fuhs, appellant's company commander, testified that the incident to which appellant confessed occurred on a weekend. The NCIS delivered a copy of the confession to the Battalion Officer of the Day (OOD), who called Capt Fuhs at his quarters. Capt Fuhs took a copy of the confession home, notified his executive officer of the incident, and on Monday, he made a copy of the statement and gave it to 1stSgt Bressler. He told 1stSgt Bressler that he could use the statement, with the name and social security number blacked out, "to teach the staff NCOs about what's going on with our Marines." He told 1stSgt Bressler to "get the word out ... that this type of behavior will not be tolerated within this command." Capt Fuhs testified that, at the weekly company formation, he told his Marines that "we had a Marine that did something that Marines do not do, and we will not tolerate this type of behavior." He quoted the portion of the statement reciting that "they thought it would be fun to go out and jack somebody up," and told his Marines that he "was appalled and disgusted ... by just that type of an attitude of a U.S. Marine." Capt Fuhs testified that, in a discussion with his noncommissioned officers (NCOs) and section heads, he told them that "any Marine that would portray this type of behavior does not deserve to wear the uniform."

Capt Fuhs testified that he had "no personal dealings" with appellant and had "no personal opinion as to his military character," but that he formed an opinion after reading appellant's confession. He testified that, after reading the confession, he "was disgusted by the behavior."

1stSgt Bressler testified that, after his discussion with Capt Fuhs, he talked with two of the senior enlisted Marines in the unit, Master Gunnery Sergeant (MGSgt) Wright and MGSgt Truelove. He told them that he "felt there was a void in some type of leadership." He testified that he "was concerned that maybe something went wrong, and it was leadership." He made "a couple copies" of the statement, one for CWO Harris, the OIC of appellant's duty section, and one for "the master gunny."

At a regularly scheduled formation, 1stSgt Bressler had "a school circle," at which he addressed "a number of things," including the "jacking" incident. 1stSgt Bressler described the formation as follows:

And basically at the formation I said that people hearing that type of terminology [referring to "jacking"] as good sorts or good Marines are more—have a responsibility to talk to their fellow neighbors about that type of behavior or that type of language, number one; and number two, that I was available to help anybody with problems or—someone that thought that they might have to conduct this type of behavior or this type of language—and that we need to get in touch as Marines with each other and the environment we live in because I felt a void.

I was astonished that—how could a Marine that—I mean, I had never heard [appellant's] name before in our company be allegedly involved in something like this, and no one can tell me or give me any information on it. I mean, how can we let that happen? So, I felt that I needed to tell everybody you're not in touch. I mean, we need to get—be more aware of what's happening around us and with each other, and that was basically the point of it, sir.

Although 1stSgt Bressler did not mention appellant by name, he testified that he thought "a few people there probably knew who I was talking about," particularly those Marines from appellant's section. By this time, appellant was not present for duty, having been placed in pretrial confinement.

1stSgt Bressler testified that he did not "personally know" appellant before the incident. He testified that, after reading appellant's confession, he "was a little embarrassed." He reacted to the confession by thinking, "I guess we have a problem. Let's see how we can set out to fix it." Asked about the impact of the confession on his opinion of appellant, the first sergeant testified that he did not think any more or less of appellant, because he "didn't even recognize the name."

CWO Harris testified that she was uncertain how she learned about the incident involving appellant, but she thought it might have been from one of her senior staff NCOs, "because usually that's how they come in." She never received a copy of appellant's

statement, but saw a copy with appellant's name blacked out. She admitted that she probably had told SSgt Lawson that she thought appellant was a thug. CWO Harris was asked if she thought her comment might have intimidated SSgt Lawson from testifying. She responded as follows:

> In the case of Staff Sergeant Lawson, no, sir, because the only reason I said what I said was because of what Staff Sergeant Lawson said first. Staff Sergeant Lawson, as I said, thinks Lance Corporal Biagase's impeccable....

Asked if she might have indirectly intimidated SSgt Lawson, she responded in the negative, "because I know Staff Sergeant Lawson." She explained that, if she had been speaking to a Marine who "was a little weak," her comment may have been intimidating, but she did not think she swayed SSgt Lawson.

CWO Harris testified that her evaluation of any Marines whom she rated would not be affected by the fact that they testified on appellant's behalf. She testified that her opinion of appellant, based on the information in his confession, "[was] totally irrelevant to what anybody else above me or below me thinks." She testified that she did not know appellant "whatsoever."

MSgt Stanton testified that, when he learned about the incident and saw appellant's confession, he did not believe it, because "until the incident, he was one of the best Marines I had." At the regularly scheduled formation, he told his Marines "that the military really couldn't tolerate situations like that because it was unbecoming." He told them that "when they go out in town, they got to conduct themselves as Marines." MSgt Stanton did not have a copy of appellant's confession at the formation, but "just went off the top of [his] head." He did not mention appellant, but he believed that the Marines knew he was talking about appellant, because "everybody already knew he was in the brig." MSgt Stanton testified that he did not feel "in any way reluctant" to express his favorable opinion of appellant. He did not believe that any of his superiors

would affect his fitness reports if he testified favorably for appellant.

After the witnesses on the motion to dismiss had testified, the military judge asked defense counsel if any witnesses had refused to testify. Defense counsel responded that no witnesses had refused, but that the dissemination of appellant's statement by the command "definitely had an impact on them" by painting appellant as a "bad character," even before the trial began.

The military judge denied the motion to dismiss. His explanation of the basis for his ruling included the following comments:

> Certainly I do not deem it appropriate that a statement of an accused be Xeroxed, somehow reproduced, and provided to various members of the command even though it may have been with good intentions; that is, even though it may have been for the purpose, as has been expressed here, to teach others of the kind of conduct that should not be tolerated.... However, after having heard all of the evidence to include that by the potential witnesses on behalf of the defense and the questioning by both counsel as well as that by myself, I believe the government has likewise sustained its burden by clear and convincing evidence that unlawful command influence did not, in fact, exist.

> I am satisfied beyond a reasonable doubt that there has been no unlawful command influence in this case based on everything that I have heard.

The military judge then directed that Capt Fuhs, 1stSgt Bressler, CWO Harris, MSgt Stanton, and SSgt Lawson be brought into the courtroom, where he chastised them for distributing and commenting on appellant's statement in unit formations. The military judge's comments included the following:

> Ladies and gentlemen, I have, after a lot of searching, denied a defense motion for unlawful command influence. I do not believe that there has been unlawful command influence. That is not to say that I do believe things were done properly. I believe that you have come carelessly close to compromising the judicial integrity of these proceedings, and I want to make

sure that all of you understand that this is a Federal Court of the United States, and I will not under any circumstances tolerate anybody that even remotely attempts to compromise the integrity of these proceedings....

[A]nd although I have denied the motion, I am going to take some remedial action. I am directing and ordering at this time that with regard to anyone who testified on behalf of Lance Corporal Biagase that First Sergeant Bressler be removed from their reporting chain, that he have no influence whatsoever over the fitness reports or pro/con marks or any evaluation of anybody that testifies in these proceedings. Second of all, anyone who testifies in these proceedings on behalf of Lance Corporal Biagase, if their pro/con marks or fitness report or evaluation of any sort is lower than it was on their last reporting period, I am directing that written justification be attached to that.

The military judge further announced that he would allow the defense "a great deal of latitude" during *voir dire* of prospective court members, and would liberally grant challenges for cause. Finally, he told the assembled members of appellant's command:

> Additionally, if there are witnesses which the defense desires be called on behalf of Lance Corporal Biagase that you are aware of that have otherwise been reluctant to testify out of fear or concern for their professional well being, I will issue a blanket order to produce any such witness.

The Court of Criminal Appeals came to the same conclusion as the military judge, stating that it was "convinced beyond a reasonable doubt that unlawful command influence, actual or apparent, did not exist," and concluding further that, "[e]ven assuming, *arguendo*, that unlawful command influence existed, we are convinced beyond a reasonable doubt that neither the findings nor the sentence were affected." Unpub. op. at 4–5.

### Discussion

Before this Court, appellant argues that the issue of unlawful command influence was

raised, and that the Government failed to meet its burden of proving beyond a reasonable doubt that the findings and sentence were not affected by the unlawful command influence. The Government asserts that it proved, by clear and positive evidence, that there was no unlawful command influence. The Government further argues that, assuming that unlawful command influence existed, this Court should be satisfied beyond a reasonable doubt that the findings and sentence were unaffected.

There is a disagreement between the two sides about the Government's burden on the issue whether command influence existed. The defense asserts that, in *United States v. Argo*, 46 MJ 454 (1997), this Court eliminated the intermediate level of proof, *i.e.*, proof by clear and positive evidence that there was no unlawful command influence. The defense relies on the following passage from *Argo:*

> "The defense has the initial burden of producing sufficient evidence to raise unlawful command influence...." Once the issue is raised, "the appearance or existence of unlawful command influence creates a rebuttable presumption of prejudice." *United States v. Wallace*, [39 MJ 284, 286 (CMA 1994)]. In cases where unlawful command influence has been exercised, we will not affirm the decision below ... unless we are "persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence."

*Id.* 46 MJ at 457 (citations omitted).

The defense argues that this passage "excludes any interim burden which might allow the Government to disprove the existence of unlawful command influence by 'clear and positive' evidence." The defense argues further that "the correct test for a trial or appellate court is whether it has been persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence." Final Brief at 9.

The Government characterizes the quoted passage from *Argo* as an "unfortunate scrivener's error," and argues that *Argo* did not remove the Government's opportunity to disprove unlawful command influence. Final Brief at 7. The Government further argues

that its burden at the trial level is to prove by clear and positive evidence, not beyond a reasonable doubt, that there was no unlawful command influence.

The military judge's ruling is susceptible of more than one interpretation, because he recited two different legal tests, first ruling that the Government had sustained its burden "by clear and convincing evidence that unlawful command influence did not, in fact, exist," and then announcing that he was satisfied "beyond a reasonable doubt that there [was] no unlawful command influence." The Government interprets the military judge's ruling as premised on an intermediate burden of proof. Under the Government's interpretation, the military judge ruled that the issue of unlawful command influence was raised, and that the Government rebutted it by clear and convincing evidence. The parties appear to agree that the military judge was satisfied beyond a reasonable doubt that there was no prejudice from any unlawful command influence that may have existed. For the purposes of this decision, we accept the Government's interpretation of the ruling regarding the intermediate burden of proof.

The requirement that the Government make a "clear and positive" showing that the proceedings were not tainted was first articulated in *United States v. Adamiak*, 4 USCMA 412, 417–18, 15 CMR 412, 417–18 (1954), a case involving unauthorized communications with a court member. It was repeated in *United States v. Rosser*, 6 MJ 267, 272 (CMA 1979), also involving improper communications with a court member, but couched in terms of unlawful command influence. Both *Adamiak* and *Rosser* held that the presumption of prejudice arising from the unauthorized communications with court members must be rebutted by a clear and positive showing that the error did not taint the proceedings. In both cases, there was no dispute whether the improper contact occurred. Thus, neither case addressed the evidentiary standard for proving or disproving the predicate fact, *i.e.*, whether the conversation occurred.

The requirement for a "clear and positive" showing of no prejudice was replaced in

*United States v. Thomas,* 22 MJ 388, 394 (CMA 1986). *Thomas* held that unlawful command influence was an error of constitutional dimension. Thus, *Thomas* applied the test for constitutional error and held that an appellate court may not affirm the findings or sentence "unless it is persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence."

Like *Adamiak* and *Rosser, Thomas* did not involve a dispute about the predicate facts, but only about the impact of a commander's conduct on the findings and sentence. *Thomas* articulated an appellate burden of persuasion regarding the impact of unlawful command influence, but did not address the quantum of proof required at the trial level to prove or disprove the predicate facts underlying the assertion of unlawful command influence.

In *United States v. Stombaugh,* 40 MJ 208, 213 (CMA 1994), this Court held that the defense has the initial burden of raising the issue of unlawful command influence. *Accord United States v. Ayala,* 43 MJ 296, 299 (1995). To raise the issue, the defense must (1) show facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that unlawful command influence was the cause of the unfairness. *Stombaugh,* 40 MJ at 213, citing *United States v. Levite,* 25 MJ 334, 341 (CMA 1987) (Cox, J., concurring).

In *United States v. Reynolds,* 40 MJ 198, 202 (CMA 1994), this Court defined what it means, in an appellate context, to "show" that the proceedings were unfair because of unlawful command influence. This Court held that prejudice is not presumed until the defense produces evidence of proximate causation between the acts constituting unlawful command influence and the outcome of the court-martial.

*Stombaugh, Reynolds,* and *Levite* all involved the assessment of unlawful command influence in the context of appellate litigation. The requirements of steps 2 and 3 of the test—to demonstrate that the trial proceedings were unfair and that command

influence caused the unfairness—involve assessment of a completed trial. These standards do not apply to the responsibility of the military judge during assessment of motions at trial, where any impact of unlawful command influence is a matter of potential rather than actual effect.

▮ The threshold for raising the issue at trial is low, but more than mere allegation or speculation. *United States v. Johnston,* 39 MJ 242, 244 (CMA 1994). In *Ayala,* 43 MJ at 300, this Court defined the evidentiary standard for raising the issue as the same as required to raise an issue of fact, *i.e.,* "some evidence."

▮ At trial, the accused must show facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings. *See United States v. Allen,* 33 MJ 209, 212 (CMA 1991), quoted in *Stombaugh,* 40 MJ at 213.

▮ Once the issue is raised at the trial level, the burden shifts to the Government, which may either show that there was no unlawful command influence or show that the unlawful command influence will not affect the proceedings. *United States v. Gerlich,* 45 MJ 309, 310 (1996). In *Gerlich,* this Court observed that it had not yet "specifically delineated any distinction between the presumption of the existence of command influence and the presumption of prejudice or harm to an accused." *Id.* at 311. In *Stombaugh,* this Court strongly suggested that there is no distinction, remarking that, in *Thomas,* this Court had created an exception to RCM 905(c)(1),[2] which requires proof by a preponderance of the evidence. We pointed out that, in *Thomas,* "we enunciated for the first time that the test for a judge and an appellate court is that it must be 'persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence.'" 40 MJ at 214. Likewise, in *Argo,* this Court remarked that there is a rebuttable presump-

---

2. Manual for Courts–Martial, United States, 1984.

tion of prejudice, "once the issue is raised." We then repeated the *Thomas* legal test, requiring that we be "persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence." 46 MJ at 457.

■ Implicit in our decisions involving unlawful command influence is the recognition that two distinct issues are involved after the burden shifts to the Government: (1) what must be proven? and (2) what is the quantum of proof required? With respect to the first, we now expressly reaffirm and amplify what we said in *Gerlich*. The Government may carry its burden (1) by disproving the predicate facts on which the allegation of unlawful command influence is based; (2) by persuading the military judge or the appellate court that the facts do not constitute unlawful command influence; (3) if at trial, by producing evidence proving that the unlawful command influence will not affect the proceedings; or (4), if on appeal, by persuading the appellate court that the unlawful command influence had no prejudicial impact on the court-martial. Thus, we reject appellant's argument that *Argo* eliminated the intermediate level of proof and removed the Government's opportunity at the trial level to disprove the existence of unlawful command influence.

■ With respect to the second issue, we now state explicitly what we suggested in *Gerlich, Stombaugh,* and *Argo* regarding the quantum of proof required: once an issue of unlawful command influence is raised, the Government must persuade the military judge and the appellate courts beyond a reasonable doubt that there was no unlawful command influence or that the unlawful command influence did not affect the findings and sentence. As we said in *Stombaugh,* the quantum of proof applicable to issues of unlawful command influence is an exception to RCM 905(c)(1), which requires proof by a preponderance of the evidence. After our decision in *Thomas,* the less demanding test for "clear and positive evidence" used in *Rosser* and *Adamiak* was no longer correct. The correct test is proof beyond a reasonable doubt.

■ Thus, once the issue of unlawful command influence is raised, the Government must prove beyond a reasonable doubt: (1) that the predicate facts do not exist; or (2) that the facts do not constitute unlawful command influence; or (3) that the unlawful command influence will not prejudice the proceedings or did not affect the findings and sentence. Accordingly, we hold that the military judge erred by applying the wrong legal test when he concluded that the prosecution had "sustained its burden by clear and convincing evidence that unlawful command influence did not, in fact, exist."

■ Notwithstanding the military judge's use of the wrong legal test, appellant is not entitled to relief. The prosecution did not dispute the predicate facts, *i.e.,* that various members of the chain of command disclosed the details of appellant's confession to members of the unit at regularly scheduled formations, and expressed strong disapproval of the conduct described in appellant's confession. The prosecution did not dispute that, even though appellant's name was not disclosed, appellant's co-workers knew he was the person whose confession was being discussed. The military judge recognized that the command's pretrial condemnation of appellant's conduct had the potential to deter members of the command from coming forward and supporting appellant. He concluded that the defense had produced "some evidence," but expressed doubt whether it was sufficient to raise the issue of unlawful command influence.

SSgt Lawson testified that his concern about his credibility as a noncommissioned officer was based on his feeling of guilt about the adequacy of his leadership, and not as a result of command pressure. He testified unequivocally that no one tried to intimidate him or dissuade him from testifying.

On the other hand, LCpl Calloway was initially reluctant to testify, because he did not want his command to think that he wanted "to be like [appellant]." In short, he was afraid of guilt by association. His fear arose from the command's improper exploitation of appellant's confession. However, at the court-martial, he also testified that he was

not concerned about any adverse action if he testified for appellant. He further testified that those Marines who did not know appellant before the incident did not want anything to do with him, but those Marines who had a favorable opinion of his conduct and performance before the incident were willing to come forward and testify.

The military judge ultimately concluded that the issue of unlawful command influence had been raised by the defense. Because we are satisfied beyond a reasonable doubt that the findings and sentence were unaffected, we need not review or disturb his ruling that the issue was raised; nor do we find prejudice from his use of the wrong legal test.

We recently recognized in *United States v. Rivers*, 49 MJ 434 (1998), that a military judge can intervene and protect a court-martial from the effects of unlawful command influence. In this case, the military judge forcefully and effectively discharged his duties as the "last sentinel" to protect the court-martial from unlawful command influence. In addition to exhaustively examining the facts, he took the extraordinary steps of chastising the entire chain of command and supervision in open court, removing the first sergeant from the rating chain of any witness who testified, requiring justification for any downward movement in the witnesses' ratings, and requiring that any witness who indicated reluctance to testify be produced.

■ The best indicator of the lack of prejudice is the fact that all the members of appellant's chain of command who knew him testified favorably. Four noncommissioned officers, MSgt Stanton, SSgt Lawson, Sgt Thomas, and Cpl Gibbs, all gave strong and favorable testimony on findings as well as sentence. The three members of his chain of command who did not testify for appellant (Capt Fuhs, 1stSgt Bressler, and CWO Harris) testified during the motion hearing that they had no personal knowledge of appellant's military qualities. LCpl Calloway, who testified on the motion to dismiss, expressed his willingness to testify during the motion hearing, but was not called as a character witness, for reasons not disclosed by the record. Defense counsel stated on the record that no witnesses had refused to testify. To date, appellant has proffered no evidence that any witnesses were deterred from testifying. Accordingly, we are satisfied beyond a reasonable doubt that the findings and sentence were untainted by unlawful command influence.[3]

## Decision

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.

SULLIVAN, Judge (concurring in the result):

In my view, the issue of unlawful command influence was raised in this case, and properly so. *See* Art. 37, Uniform Code of Military Justice, 10 USC § 837. Public, pretrial condemnation of an accused by his first sergeant is illegal command influence. *United States v. Martinez*, 42 MJ 327, 331–32 (1995). The real damage from such statements is a possible poisoning of the jury and the witness pools.

The Government, on appeal, does not argue that the issue of command influence was not properly raised at trial, and the military judge expressly ruled that it was raised at trial. The majority, in its timid dance with command influence, refuses to even state with firmness that it was raised, much less existed in this case. I disagree and state that command influence was not only in the air but on the ground where the first sergeant publicly condemned appellant's actions before his trial.

---

3. The command misconduct in this case might well have been characterized as pretrial punishment instead of an unlawful attempt to deter witnesses from testifying. *See* Art. 13, UCMJ, 10 USC § 813; *United States v. Cruz*, 25 MJ 326 (CMA 1987). However, appellant has not asserted that he was subjected to pretrial punishment.

We are satisfied that the pretrial public humiliation inflicted on appellant in this case falls far short of the conduct condemned by this Court in *Cruz*. Furthermore, unlike Cruz, appellant had the opportunity to ask the court members to consider his pretrial humiliation in assessing an appropriate sentence. He chose not to do so.

Furthermore, I strongly disagree with the statement of the appellate court below that the command's actions in this case were a "legitimate and necessary exercise of leadership." Unpub. op. at 3. Congress has precluded this activity in Article 37 when it may "influence the action of a court-martial ... or any member thereof." Command lectures or addresses on pending military justice matters, even if for a good leadership purpose, are prohibited if those actions may influence a court-martial. *United States v. Cruz*, 25 MJ 326, 329 (CMA 1987); *United States v. Levite*, 25 MJ 334, 339 (CMA 1987); *United States v. Brice*, 19 MJ 170, 172 (CMA 1985);

*United States v. McCann*, 8 USCMA 675, 676, 25 CMR 179, 180 (1958). Moreover, I seriously doubt that Marines need to be advised that gang robberies or "jackings" are inappropriate conduct.

Nevertheless, I agree with the result of the majority opinion. Its prejudice analysis shows beyond a reasonable doubt that appellant was not harmed by the misguided actions of his military superiors. The real hero in this case is the military judge, who took strong steps to insure (1) that the jury and witness pools were not poisoned; and (2) that appellant received a fair trial.