BAKER, Judge
(dissenting):
I do not believe Appellant has met his initial burden under United States v. Biagase, 50 M.J. 143, 150 (C.A.A.F.1999), of showing “some evidence,” which if true, would constitute unlawful command influence. Therefore, I respectfully dissent. However, while the case law does not require military judges to proactively intervene in the absence of some evidence of unlawful command influence, I believe they should as a matter of legal policy where, as in this case, the unlawful command influence door is left ajar. Accordingly, as a matter of legal policy, but not law, I agree with the disposition of this ease. Based on the facts of this case as well as the special responsibility military judges have with respect to allegations of unlawful command influence, I believe the military judge should have done more to inquire of the members notwithstanding trial defense counsel’s decision not to do so himself.
*29 I. Application of Biagase
In Biagase this Court held that the test for raising unlawful command influence is “some evidence” of “facts, which if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial in terms of its potential to cause unfairness in the proceedings.” Id. at 150 (citation and quotation marks omitted). The accused bears the burden of establishing some evidence of unlawful command influence. Id. If this burden is met, then the burden shifts to the government to show either that there was no unlawful command influence or that such influence will not affect the proceedings. Id. (citing United States v. Gerlich, 45 M.J. 309, 310 (C.A.A.F.1996)).
The majority concludes that Appellant met his burden of initial persuasion based on three circumstances: the squadron’s executive officer (XO), who was the original convening authority, entered the court-martial dressed in a flight suit and observed closing arguments, defense counsel suggested that the members were distracted by the XO’s presence, and the military judge acknowledged that the squadron XO and a senior member of the panel knew one another. Indeed, the majority concludes that “the prosecution fail[ed] to rebut the taint of unlawful command influence” in this case. Thus, the military judge erred in not shifting the burden to the Government to rebut the evidence of unlawful command influence.
I am not persuaded that Appellant carried his initial burden of establishing some evidence, which if true, would amount to unlawful command influence. First, unless we adopt a per se rule barring a convening authority from attending a court-martial, then the original convening authority’s qua XO’s presence in this case, without more, should not amount to unlawful command influence. There might be arguments for barring convening authorities generally, or in context, from attending courts-martial.
There are also arguments against adoption of a per se rule. First, the Rules for Courts-Martial (R.C.M.) themselves provide that courts-martial shall be open to the public. See R.C.M. 806(a) (“Except as otherwise provided in this rule, courts-martial shall be open to the public.”). In addition, there may be circumstances where the convening authority might attend a court-martial or series of courts-martial to set a leadership example, show respect for the rule of law, or perhaps ensure that an accused receives a fair trial.
Second, the fact that the squadron XO of an aviation squadron at an air facility was wearing a flight suit, the customary uniform of the day on an air facility, is not remarkable, nor is it evidence of unlawful command influence. This is true, even in a case involving flight safety.
Third, the majority cites to the fact that Captain (CPT) Cisneros, the senior member of the panel, “knew” the XO. This is unremarkable. She was a member of the XO’s squadron, a fact identified and explored during voir dire, when trial defense counsel asked CPT Cisneros how she knew Major (MAJ) Loughlin, the convening authority. CPT Cisneros responded, “He’s the XO of H&HS, sir.” When trial defense counsel then asked CPT Cisneros whether there was “anything about [CPT Cisneros’s] relationship with [MAJ Loughlin] that would cause [her] to lean towards the government or the defense side” in this case, CPT Cisneros stated, “No, sir.” The member was not challenged for cause. So the real issue here is whether officers from the convening authority’s squadron should have been serving on this court-martial. But this is not Appellant’s claim, and we have not previously precluded such panel membership on that ground alone. Neither can we know whether Appellant might have thought it beneficial to have officers on his panel who were familiar with his reputation and performance in the squadron.
Two arguments made by the trial defense counsel also figure into the majority’s analysis. The trial defense counsel asked for a mistrial on the ground that it was “obvious during the whole closing argument that the panel was looking over our shoulder.” The military judge disagreed and stated that he “didn’t see that.” The military judge’s words are ambiguous. He might not have seen *30 what trial defense counsel saw, or having seen what he saw, did not share trial defense counsel’s evaluation. This might have been quickly resolved had trial defense counsel sought to obtain some evidence of unlawful command influence from the members themselves when offered the opportunity to voir dire the members.[1]
Further, the trial defense counsel stated that one of the members was “intimately familiar” with the convening authority qua XO. However, this is not a fact, nor some evidence, but a turn of phrase now twisted by Appellant to infer possibilities already addressed and resolved during voir dire. The member in question was familiar with the XO as she was an officer in his squadron. And, as established during voir dire, this familiarity was professional and not personal.[2] (The majority states that it gives this factor little weight. Based on the analysis above, I give it no weight.)
For the reasons stated, applying the Biagase framework to the facts of this case, I do not believe Appellant carried his burden at trial of identifying some evidence, which if true, would amount to unlawful command influence.
II. Legal Policy and Unlawful Command Influence
However, the analysis should not stop here, for in this case there is tension between two propositions, one founded in case law and the other found in the same ease law’s descriptive dicta. Even if Appellant did not establish “some evidence” of unlawful command influence, was the military judge nonetheless obliged to do something more as a general matter, or based on the particular circumstances of this case, as a so-called sentinel against unlawful command influence? Here, I share the majority’s conclusion that the primary issue is whether the military judge properly performed his sentinel duties based on the presence of the convening authority in the courtroom during closing arguments in Appellant’s case.
At the same time that Biagase established the framework for addressing unlawful command influence claims, it also reaffirmed that military judges “can intervene and protect a court-martial from the effects of unlawful command influence.” Biagase, 50 M.J. at 152; see also United States v. Rivers, 49 M.J. 434, 443 (C.A.A.F.1998) (“In this ease, the military judge performed his duty admirably. His aggressive and comprehensive actions ensured that any effects of unlawful command influence were purged and that appellant’s court-martial was untainted.”); United States v. Stoneman, 57 M.J. 35, 42 (C.A.A.F.2002) (“This Court has long recognized that, once unlawful command influence is raised, “we believe it incumbent on the military judge to act in the spirit of the Code by avoiding even the appearance of evil in his courtroom and by establishing the confidence of the general public in the fairness of the court-martial proceedings.’ ” (quoting United States v. Rosser, 6 M.J. 267, 271 (C.M.A.1979))). This responsibility is distinct from the military judge’s other responsibilities. This responsibility emerges from the history, real and perceived, of unlawful command influence in the military justice system. It goes to the core of the military justice system and its capacity to be fair and just. It represents the crux of Congress’s purpose in establishing a Uniform Code of Military Justice, an independent civilian federal court to hear appeals based upon it, and subsequently in establishing an independent military judiciary.
When it comes to unlawful command influence, military judges are not mere bystanders at the courts-martial over which they preside. Although this Court has thus far declined to hold military judges independent *31 ly responsible for identifying and remedying unlawful command influence, our decisions support the ability of military judges to do just that. See, e.g., Biagase, 50 M.J. at 152; Rivers, 49 M.J. at 443. Thus, as distinct from the military judge’s responsibilities as evidentiary gatekeeper where, for example, the military judge is typically only required to act in response to counsels’ arguments, military judges in the unlawful command influence context have a greater responsibility to intervene to ensure that the proceedings are fair and that the record is complete.
In this case, the military judge could have easily gone one step further in testing the facts. Were members in fact distracted, and perhaps influenced by the convening authority’s presence? Or, was trial defense counsel incorrect in his observation that the members were looking over his shoulder during closing arguments? The only way to resolve this uncertainty effectively was to ask the members themselves. The military judge could have taken it upon himself to make such inquiry, even after trial defense counsel declined the opportunity to do so. Although it is not clear from the record why trial defense counsel chose not to question the members himself, he may have had other tactical issues in mind, for example, not drawing the members’ attention to the convening authority. Such tactical decisions may be made in other cases as well, strengthening the need for military judges to intervene where there is even the mere possibility of unlawful command influence. Had the military judge opted to inquire himself, any question regarding unlawful command influence might well have been resolved at the trial level.
III. Conclusion
Under this Court’s case law, the defense bears the threshold burden of showing “some evidence” of unlawful command influence before the burden shifts to the government to rebut or negate the potential of such taint. Biagase, 50 M.J. at 150. Absent such a showing of some evidence, our case law has not assigned to the military judge an independent duty to investigate allegations of unlawful command influence. Therefore, I respectfully dissent from the majority’s application of Biagase to the facts of this case.
However, as a matter of legal policy, I agree with the disposition in this case. Military judges should have an independent responsibility to look beyond counsel’s arguments and test the facts where the unlawful command influence door is left ajar and needs either to be opened to let in the light or firmly closed. In this ease, the military judge could have, and should have, done more to determine whether the members were influenced by the presence of the original acting convening authority during closing arguments, notwithstanding trial defense counsel’s decision not to voir dire the members.
In light of my conclusion that there was no legal error on Issue I, I agree with the majority’s conclusion that Appellant has not demonstrated prejudice under Barker v. Wingo, 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In any event, assuming Appellant was denied his due process right to timely review and appeal, that error was harmless beyond a reasonable doubt in this case. United States v. Allison, 63 M.J. 365 (C.A.A.F.2006).

. MJ: Do you desire to voir dire any of the members?
DC: No, sir.

. Q: How is it that you know the convening authority, which would be Major Loughlin?
A: He's the XO of H&HS, sir.
Q: And you're a member of that squadron?
A: Correct, sir.
Q: Is there anything about your relationship with him that would cause you to lean towards the government or the defense side in this case?
A. No, sir.