# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS
## Washington, D.C.

## UNITED STATES

### v.

## Francesco THOMPSON
### Aviation Maintenance Technician Second Class (E-5), U.S. Coast Guard

## CGCMS 24435

## Docket No. 1338

## 11 July 2011

Special Court-Martial convened by Commanding Officer, Coast Guard Training Center Cape May. Tried at Cape May, New Jersey, on 26 August and 22-23 September 2009.

| | |
|---|---|
| Military Judge: | CDR Katherine E. Weathers, USCG |
| Trial Counsel: | LT Kismet R. Wunder, USCGR |
| Assistant Trial Counsel: | LCDR Michael R. Sinclair, USCG |
| Defense Counsel: | LT Brandi R. Orton, JAGC, USN |
| Assistant Defense Counsel: | LT Mark E. deVry, JAGC, USN |
| Appellate Defense Counsel: | LT Kelley L. Tiffany, USCGR |
| | LT Shadrack L. Scheirman, USCG |
| Appellate Government Counsel: | LCDR Douglas K. Daniels, USCG |

## BEFORE
## McCLELLAND, LODGE & McTAGUE
Appellate Military Judges

McCLELLAND, Chief Judge:

Appellant was tried by special court-martial, military judge alone. After entering mixed pleas pursuant to a pretrial agreement, Appellant was convicted of three specifications of failure to obey lawful orders, in violation of Article 92, Uniform Code of Military Justice (UCMJ); two specifications of maltreatment, in violation of Article 93, UCMJ; one specification of making a false official statement, in violation of Article 107, UCMJ; and one specification of wrongfully impeding an investigation, in violation of Article 134, UCMJ. The military judge sentenced Appellant to confinement for five months, reduction to E-1, and a bad-conduct discharge. In

accordance with the pretrial agreement, the Convening Authority disapproved confinement in excess of 110 days and otherwise approved the sentence.

Before this court, Appellant has assigned the following errors:

I.    Appellant was deprived of a fair trial by the military judge's failure to dismiss the charges and specifications after she found that unlawful command influence existed.

II.   Appellant was deprived of a full and fair clemency consideration.

III.  Appellant's plea to Specification 1 of Charge II is improvident because the military judge failed to elicit a substantial factual basis to support his plea.

We set aside the finding on Specification 1 of Charge II and dismiss it.  We reject the other two issues.  We affirm the remaining findings and the sentence.

**Facts underlying the charges**

Appellant was a company commander of recruits in training at Coast Guard Training Center Cape May.  A Coast Guard general regulation prohibited personal and romantic relationships between instructors and students at training commands.  It also prohibited sexually intimate behavior in any Coast Guard-controlled workplace.  A Training Center Cape May order prohibited personal relationships between company commanders and graduates of recruit training for one year following graduation.  Appellant knew of this order by January 2009.

Appellant engaged in a romantic relationship with SB, a woman who had been in a company he was training, in August 2008, after she graduated from boot camp.  In January 2009, when he learned he was being investigated, he called SB and urged her to tell the investigators they had not been intimate, although they had been.  This was the basis for a specification under Article 134, UCMJ.

In November and December 2008, Appellant had intercourse with MF, a woman in the company he was then training, in a classroom and an office of Training Center Cape May.  On December 25, 2008, he had intercourse with her at his off-base residence.  She graduated on 2 January 2009.  They had another date at his residence on 6 January 2009, and numerous

telephone calls in the second half of January 2009, including on 23 January 2009. These events provided the basis for three specifications under Article 92, UCMJ. Appellant told a Coast Guard investigator he had not spoken with MF on 23 January 2009, which was the basis for a specification under Article 107, UCMJ.

In the summer of 2008, Appellant made a comment with sexual overtones to SB, a female recruit previously mentioned in this opinion. The comment was the basis for a specification under Article 93, UCMJ (Charge II Specification 1). This specification will be discussed later in this opinion.

Several months later, Appellant imposed unauthorized "incentive training" on a female recruit. The "incentive training" involved requiring her to stand in an uncomfortable position. This was the basis for another specification under Article 93, UCMJ.

**Unlawful command influence**

Appellant asserts that unlawful command influence by the Command Master Chief was not remedied, and the problem was compounded by a later episode of unlawful command influence that affected two character witnesses. Accordingly, Appellant seeks dismissal of the charges with prejudice.

To establish unlawful command influence at trial, "the accused must show facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999). Once the accused has done so, "the burden shifts to the Government, which may either show that there was no unlawful command influence or show that the unlawful command influence will not affect the proceedings." *Id.* The military judge's findings of fact on the issue are reviewed under a clearly-erroneous standard (subject to our Article 66, UCMJ power), while the legal question of whether the facts constitute unlawful command influence is reviewed *de novo*. *United States v. Johnson*, 54 M.J. 32, 34 (C.A.A.F. 2000). When unlawful command influence is found, the

military judge's remedy for it is reviewed for abuse of discretion. *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004).

In this case, Appellant raised the issue of unlawful command influence by motion before trial. (Appellate Ex. VI.) Evidence was taken on the motion at a session under Article 39(a), UCMJ, and in due course the military judge found unlawful command influence based on comments by the Command Master Chief (CMC) that might have affected potential witnesses. (R. at 306; Appellate Ex. XVIII[1].) She ordered remedial action. (R. at 307; Appellate Ex. XIII.) Appellant did not object to the proposed remedy as inadequate at the time or after it was implemented, even though he did "renew" the motion at trial based on a wholly separate later incident. (R. at 328.)

Appellant now asserts that the remedy was inadequate. There is no claim or showing of any potential witness who did not testify, or other specific prejudice. We have no reason to disturb the military judge's legal conclusion that unlawful command influence occurred. We find that the military judge did not abuse her discretion in formulating the remedy for unlawful command influence. *See United States v. Douglas*, 68 M.J. 349, 355 (C.A.A.F. 2010) (appellant's silence during and after creation of remedy is instructive concerning whether military judge acted within discretion in crafting a remedy). The ordered remedy was implemented. (Appellate Ex. XIII.) We are convinced beyond a reasonable doubt that the unlawful command influence involving the CMC did not affect the findings or sentence.

Appellant raised the later episode of what he alleged to be unlawful command influence at a later Article 39(a) session. (R. at 328.) Evidence was taken on the motion, and the military judge found that the Government had proved beyond a reasonable doubt that there was no unlawful command influence regarding the two character witnesses.[2] (R. at 455, 459.) Appellant now contends that the military judge erred in her findings on the issue.

---

[1] Appellate Ex. XVIII was not a part of the original record of trial, but was attached to the record pursuant to the Government's Motion to Attach dated 3 May 2010, which we granted on 12 May 2010.

[2] A third potential witness had been brought up, and the military judge likewise found no unlawful command influence with respect to him. (R. at 460.) We agree with that conclusion.

The two character witnesses were civilian employees of a Coast Guard unit near Appellant's unit, under a separate command.  One of them was the Facilities Manager at that unit (R. at 397), and the other was his assistant (R. at 413).  Appellant was temporarily assigned to that unit pending his court-martial, and worked for the two men.  (R. at 330, 334, 398, 426.)  They agreed to serve as character witnesses for him.  (R. at 335, 399-400, 414, 427, 434-35.)  The defense counsel expected to call them during the pre-sentencing stage of the trial.  (R. at 350, 354.)

The morning before the trial was scheduled to begin, the two character witnesses were visited in their workspace by their commanding officer.  (R. at 384, 400-01, 426-27.)  He happened to be the husband of the commanding officer of Training Center Cape May, Appellant's command, as the Facilities Manager knew.[3]  (R. at 383, 402.)  The meeting related to the fact that the two witnesses planned to testify in Appellant's behalf concerning his performance under their supervision, or "character."  (R. at 385.)  The commanding officer indicated that they should feel free to testify without fear of retribution.  (R. at 384-85, 395, 401-02, 427.)  The Facilities Manager commented that he would hate to see Appellant go to jail for having an affair.  (R. at 385, 416-17.)  The commanding officer replied to the effect that there was more to the story than the characterization the Facilities Manager gave it.  (R. at 386, 405, 431.)  Both men testified to the effect that they were not intimidated in any way by the commanding officer's visit.  (R. at 402, 427.)  In fact, the Facilities Manager was pleased that his commanding officer, whom he respected highly, had taken the trouble to assure them of his support.  (R. at 401-03, 408.)  After the commanding officer left, the Facilities Manager talked with Appellant to make sure he, the Facilities Manager, understood everything that was involved in Appellant's case, and received confirmation.  (R. at 332-33, 405-06, 417-18.)

A short time later, Appellant was picked up by the assistant defense counsel to prepare for the trial the following day.  (R. at 331.)  The assistant defense counsel also met with the Facilities Manager and his assistant, apparently just before driving away with Appellant.  (R. at 334, 406, 430.)

---

[3] Also, the Facilities Manager's wife worked as a civilian employee at Training Center Cape May, as his commanding officer knew.  (R. at 386, 411.)

In late afternoon, the defense counsel received a call from the Facilities Manager, in which the Facilities Manager indicated that he was upset with the assistant defense counsel, who was going to use something he, the Facilities Manager, had told him, and angrily declared that if asked about his commanding officer's visit, he would deny it, and they could not make him testify. (R. at 351-55, 369-71, 410, 415.)

The Facilities Manager was called to testify on the motion concerning unlawful command influence. In addition to his testimony reflected in the above narrative, he also testified that he did not like having his commanding officer dragged into the matter with an implication that the commanding officer was obstructing justice or some other "nefarious situation." (R. at 403, 408, 412.) Toward the end of his testimony, the military judge asked him if he was still willing to testify on behalf of Appellant as a character witness, and he said yes. (R. at 414.) His assistant likewise testified on the motion to the effect that he expected to testify as a character witness on Appellant's behalf in the same way he had planned to do many weeks earlier. (R. at 434-35.) But he also testified that if there was a possibility of being "shanghaied" into a "trick defense," he would prefer to provide a written statement rather than testimony. (R. at 428-29.)

The military judge ruled that the Government had proved beyond a reasonable doubt that there was no unlawful command influence. She did not render written findings of fact, but did call attention to the Facility Manager's statement that he was honored to have his commanding officer come to his office. She went on to say, "I found it pretty convincing and pretty clear that his anger was towards the feeling that this was being turned into something that he believed wasn't, and that he was really uncomfortable with the feeling that he had caused this and created this."[4] She further stated that she "found him sincere, that he is going to come testify, that he wants to come testify on behalf of [Appellant]." (R. at 455.)

Thereafter, the defense informed the military judge that the Facilities Manager had said after leaving the courtroom that he now preferred to provide a written statement. (R. at 456.) Trial counsel responded that he understood that the Facilities Manager had a scheduling concern.

---

[4] We regard this statement by the military judge as a finding of fact. It is not clearly erroneous.

(R. at 456.) The military judge directed follow-up on the matter, and recessed the court-martial for lunch. (R. at 456-58.) It was then about 1330 hours.

After the luncheon recess, the military judge reiterated the ruling, acknowledged that the two witnesses would not be testifying but submitting letters, and stated that whether or not they testified did not influence her ruling. (R. at 459.) She nevertheless sought to learn whether the witnesses would testify. The answer, at 1430 hours, was that the Facilities Manager was dealing with a water leak emergency and in any event was reluctant to testify "based on everything that happened with Defense Counsel," and his assistant had left the office for the day and was unwilling to come back to testify.

The court-martial then proceeded with pleas, providence inquiry, trial on the contested specification, and findings. Findings were announced after 2000 hours. The military judge stated that the sentencing stage would begin the following morning. Before the court recessed, the matter of the two character witnesses was raised. The defense confirmed that they did not seek to have subpoenas issued to the witnesses, and were satisfied with their statements; however, the witnesses' voluntary testimony remained a possibility. (R. at 646-47.)

The next day, when the time came for the defense case on sentencing, the two witnesses' written statements were received in evidence, along with other materials. (R. at 730; Defense Ex. I and J.) The defense stated on the record that both individuals were not able to appear in person. (R. at 731.)[5]

The evidence supporting the foregoing narrative is consistent and without contradictions. Appellant's argument that the military judge's findings were erroneous is directed to the fact that, contrary to the military judge's statement that the Facilities Manager was "going to come testify, that he wants to come testify," the Facility Manager did not testify in person. But the

---

[5] It seems clear that the original plan was for a one-day trial, and the new unlawful command influence issue introduced scheduling uncertainties. There is mention in the record that witnesses were waiting outdoors for several hours before they were called to testify. (R. at 391, 414, 423.)

military judge acknowledged this possibility after it was brought to her attention, and stated that this did not affect her ruling.

Appellant goes on to argue that the fact that both witnesses were, "at the last minute, unavailable to come and testify on behalf of Appellant clearly shows that [their commanding officer's] statement had a prejudicial effect on their willingness to appear in person in court to speak on Appellant's behalf." This argument completely ignores all the testimony on the incident, which is unequivocally to the effect that both witness never thought they were being intimidated and were not intimidated by him,[6] and the commanding officer's messages do not appear intimidating in themselves. Any reluctance to testify was based on the witnesses' perceptions of the defense's actions. There was no unlawful command influence by the witnesses' commanding officer.

### Post-trial review

Appellant contends that the Convening Authority and the Staff Judge Advocate (SJA) should not have participated in the post-trial process, because the Convening Authority's immediate post-trial statements demonstrated preconceived bias, and the SJA had served as a witness on the issue of unlawful command influence.[7]

A convicted servicemember is entitled to individualized consideration of his case post-trial, by a neutral convening authority willing to consider the member's individual case fully and fairly. *United States v. Davis*, 58 M.J. 100, 103 (C.A.A.F. 2003). A staff judge advocate may be ineligible to provide the post-trial recommendation to a convening authority if he or she has testified as to a contested matter (unless the testimony is clearly uncontroverted), has other than an official interest in the case, or must review that officer's own pretrial action when the sufficiency or correctness of the earlier action has been placed in issue. Rule for Courts-Martial (R.C.M.) 1106(b) Discussion, Manual for Courts-Martial, United States (2008 ed.). Whether a staff judge advocate or convening authority is disqualified from participating in the post-trial

---

[6] There was testimony that the Facilities Manager had made a prior inconsistent statement (R. at 354), but it is double hearsay and undeveloped.

[7] Appellant's actual assignment of error was: "Appellant was deprived of a full and fair clemency consideration where his command unlawfully influenced prospective defense witnesses." The issue as argued has a somewhat different basis than this statement implies.

review is a question of law that is reviewed *de novo*. *United States v. Taylor*, 60 M.J. 190, 194 (C.A.A.F. 2004).

According to an online article in the Cape May County Herald following the trial, which was enclosed with a clemency request to the Convening Authority, the Convening Authority said Appellant's behavior was inconsistent with the Coast Guard's core values of honor, respect and devotion to duty as well as the command's watchwords of character, courage and commitment. "It violates our service's Guardian Ethos which calls for all Coast Guard members to protect, defend and save the public and each other," she said, according to the article.

Appellant complains that these comments betray a preconceived bias against him, being neither neutral nor detached. However, the comments pertain only to Appellant's behavior, which surely means the offenses of which he was found guilty. They say nothing about the consequences of that behavior, that is, the sentence, which is the subject of clemency, the focus of Appellant's complaint.[8] In fact, the comments are so general as to betray only a bias against unlawful behavior, which is certainly not disqualifying. *See Davis*, 58 M.J. at 103 ("A commanding officer or convening authority fulfilling his or her responsibility to maintain good order and discipline in a military organization need not appear indifferent to crime.").

Appellant also appears to invoke unlawful command influence in his argument that the Convening Authority should not have been involved in the post-trial process. Nothing about the unlawful command influence found by the military judge involved the Convening Authority personally. Neither unlawful command influence nor the post-trial statements disqualified the Convening Authority from taking action on Appellant's case.

We turn to the SJA. He testified on the original unlawful command influence motion, concerning the CMC's comments (at which he was present) and some other matters, including how the court members were chosen. (R. at 251-71.) On the latter subject, he was asked a few questions (R. at 265-67), but in oral argument on the motion, the defense acknowledged that the

---

[8] Appellant raised this issue prior to the Convening Authority's action, requesting "clemency review from a different, neutral, Convening Authority." He repeats this formulation before this Court.

concern about court members who were on the Convening Authority's personal staff had been remedied (R. at 279); the SJA's testimony was not controverted.

The military judge found unlawful command influence based on the CMC's comments, but not based on the other matters, and ordered a remedy. Thereafter, those matters were not at issue. The SJA did not testify again, and his actions were not put at issue during the "renewal" of the unlawful command influence motion or otherwise.

After the trial, the defense submitted two letters dated 21 December 2009, styled requests for clemency, one signed by each counsel. The letter signed by LT Orton requested, among other things, that the clemency review be performed by a different neutral and detached convening authority, citing "the Unlawful Command Influence found by the Court, the subsequent actions of Unlawful command influence, and the post-trial comments in the press . . ." The letter went on, "Unlawful Command Influence was successfully brought to the court's attention regarding the following," and listed five items. The first was the CMC's comments, on which the military judge indeed had found unlawful command influence.

The next two items were the issue of selection of members, on which the SJA had given uncontroverted testimony, and another issue raised in the original motion on which the SJA had not testified.[9]

The fourth item was the matter of the two character witnesses discussed in the first section of this opinion. As noted above, the SJA did not testify on this matter and there was no issue raised about his actions with regard to the matter.[10] He was mentioned in the witnesses' commanding officer's testimony as a source of information about the charges and specifications and about the date of trial and the like. (R. at 390-91.)

The fifth item was "[t]he attendance of the Convening Authority's husband, and the Convening Authority's Staff Judge Advocate, throughout the proceedings." Their attendance

---

[9] On neither of these issues was there any finding of unlawful command influence.

[10] The military judge ruled that there was no unlawful command influence in this matter.

was noted incidentally at the end of the first day of trial, in connection with the possible future testimony of the two character witnesses. (R. at 647.) No issue had ever been raised on the record about the SJA's attendance prior to the clemency letter.

The Addendum to the SJA's Recommendation dated 7 January 2010, signed by the SJA, offered advice to the Convening Authority concerning the two defense letters. It commented on the five items, with this preface: "Defense counsel infers in their clemency request that the Military Judge found unlawful command influence in five distinct areas. For clarification, the record of trial indicates the following regarding each inference."

On the first item, the SJA concurred with the defense.

On the second and third items, the SJA described the military judge's rulings and commented that the issue of member selection was moot because trial was by judge alone. On the fourth item, likewise, the SJA described the military judge's ruling and commented on the issue.

On the fifth item, the SJA stated, "This issue was never raised or brought up prior to, during, or after any phase of the trial. CDR Thomas and myself did attend portions of the arraignment, motions hearing, trial and sentencing; but neither of us were present throughout the proceedings. During my presence at the hearings, I had numerous interactions with both Defense Counsel and neither counsel indicated or expressed any concerns with my presence."

At the end of the Addendum, the SJA confirmed, unchanged, his recommendation in the original SJA's Recommendation, and recommended that she deny the other two defense requests that apparently raised legal issues, including the request for the Convening Authority to disqualify herself, opining that both requests were without merit.

Appellant asserts that because the SJA was called as a witness by the Government on the issue of unlawful command influence, he should have recused himself from writing the Addendum.[11]

As noted above, the SJA's testimony concerning the CMC's comments was uncontroverted, especially at the time he wrote the Addendum, since relief had been granted and he specifically concurred with the defense counsel's letter on the subject of his testimony. Thus, he had no occasion to consider his own prior involvement. Our case contrasts with *United States v. Engle*, 1 M.J. 387, 389-90 (C.M.A. 1976), where the court held the SJA should have recused himself because he "had to deal not just with his previous legal opinion, but with the factual sufficiency of his own earlier work."

The same is true of the second, third and fourth items on which the SJA commented in the Addendum: either the SJA did not testify and did not play a role, or his testimony was plainly uncontroverted.

The fifth item, attendance of the Convening Authority's husband and the SJA at the trial, requires a second glance for two reasons. First, the SJA contradicts defense counsel, albeit on a minor detail, saying he and the husband were present for part of the proceedings but not "throughout the proceedings" as asserted by defense counsel. "[W]here a legitimate factual controversy exists between the staff judge advocate and the defense counsel, the staff judge advocate must disqualify himself from participating in the post-trial recommendation." *United States v. Lynch*, 39 M.J. 223, 228 (C.M.A. 1994). Second, to the extent that defense counsel is asserting some sort of legal issue involving the SJA's conduct, the SJA's advice on the matter would involve assessing his own conduct, which comes uncomfortably close to giving him other than an official interest in the case or requiring him to review his own earlier action whose correctness has been placed in issue, to paraphrase R.C.M. 1106(b) Discussion.

---

[11] Appellant actually asserts that the SJA should have recused himself from providing the SJA's Recommendation, but the specific error he identifies is the SJA's recommendation to disapprove Appellant's request for clemency review by a different convening authority, which followed the SJA's Recommendation. Hence it appears that Appellant meant to say the Addendum rather than the original SJA's Recommendation.

However, defense counsel did not develop a legal issue from the fact of the SJA's attendance at the trial, and no legal issue suggests itself. Hence any factual controversy between the SJA and defense counsel was devoid of significance, and there was nothing significant for the SJA to assess. We see no requirement for the SJA to have recused himself.

### Providence of plea to maltreatment specification

Appellant argues that his plea of guilty to Charge II Specification 1, alleging a violation of Article 93, UCMJ, was improvident because it lacked a sufficient factual basis.

The legal standard for determining whether a guilty plea is provident is whether the record presents a substantial basis in law or fact for questioning it. *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008). The record must contain a sufficient factual basis to support the plea. R.C.M. 910(e). The accused must believe and admit every element of the offense. *United States v. Whiteside*, 59 M.J. 903, 906 (C.G.Ct.Crim.App. 2004) (citing R.C.M. 910(e) Discussion). A military judge's decision to accept a guilty plea is reviewed for an abuse of discretion. *United States v. Eberle*, 44 M.J. 374, 375 (C.A.A.F. 1996). A military judge abuses this discretion if he fails to obtain from the accused an adequate factual basis to support the plea. *Inabinette*, 66 M.J. at 322.

Specification 1 of Charge II alleges, in pertinent part, that Appellant maltreated Seaman Recruit SB,

> a person subject to his orders, by stating "It was like 'Coyote Ugly' and probably not the first time I had crawled across a desk," or words to that affect [sic], in a sexually suggestive manner.

The specification as drafted has Appellant referring to his own conduct in crawling across a desk.[12] In the Stipulation of Fact, by contrast, Appellant stipulated that he commented "that it was like Coyote Ugly – a movie in which female bartenders danced in a sexually suggestive manner on top of the bar – and it was probably not the first time she had done something like this," (Prosecution Ex. 3), which refers to SB's conduct in climbing on a desk, not his own

---

[12] This is surely a mistake in drafting, but we must take it as it is written.

conduct. Likewise, during the providence inquiry, he quoted himself as saying to SB, "Don't get up there and be dancing like Coyote Ugly," (R. at 498), referring to SB's conduct.

Appellant admitted that his statement "could be construed as inappropriate or in a sexually suggestive manner," (R. at 498), and that "it is reasonable that the comment I made . . . would cause mental anguish," (Prosecution Ex. 3). He did not admit that he had said it in a sexually suggestive manner.

Article 93, UCMJ, criminalizes cruelty toward, or oppression or maltreatment of, any person subject to an accused's orders. "The cruelty, oppression, or maltreatment, although not necessarily physical, must be measured by an objective standard." Manual for Courts-Martial (MCM), United States (2008 ed.), Pt. IV, ¶ 17c(2). "It is . . . necessary to show, as measured from an objective viewpoint in light of the totality of the circumstances, that the accused's actions reasonably could have caused physical or mental harm or suffering." *United States v. Carson*, 57 M.J. 410, 415 (C.A.A.F. 2002).

It is difficult to see any of the versions of Appellant's statement as reasonably capable of causing mental harm or suffering. It is not just difficult but impossible, when Appellant did not admit that he made the statement in a sexually suggestive manner. Given the less-than-full admission of the facts alleged and the other difference between the specification and the facts elicited, we find that there was inadequate factual basis to support the plea of guilty to Charge II Specification 1. We are certain that the sentence would not have been different without this specification.

**Decision**

We have reviewed the record in accordance with Article 66, UCMJ. Upon such review, the finding of guilty of Charge II Specification 1 is set aside and the specification is dismissed. The remaining findings and the sentence are determined to be correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, the remaining findings of guilty, and the sentence as approved below, are affirmed.

Judges LODGE and McTAGUE concur.



For the Court,


L.I. McClelland
Chief Judge