*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
MONAHAN, STEPHENS, and DEERWESTER
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Cameron M. GATTIS**
Cryptologic Technician (Collection) First Class (E-6), U.S. Navy
*Appellant*

**No. 202000252**

Decided: 25 August 2021

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Wilbur Lee (arraignment)
Ann K. Minami (motions and trial)

Sentence adjudged 10 August 2020 by a general court-martial convened at Joint Base Pearl Harbor–Hickam, Hawaii, consisting of a military judge sitting alone. Sentence in the Entry of Judgment: reduction to E-1, total forfeiture of all pay and allowances, confinement for 36 months, and a bad-conduct discharge.

For Appellant:
*Captain Kimberly D. Hinson, JAGC, USN*

For Appellee:
*Lieutenant Nicholas J. Hathaway, USCG*
*Lieutenant Gregory A. Rustico, JAGC, USN*

Chief Judge MONAHAN delivered the opinion of the Court, in which Senior Judge STEPHENS and Judge DEERWESTER joined.

_____

**PUBLISHED OPINION OF THE COURT**

_____

MONAHAN, Chief Judge:

Appellant was convicted, pursuant to his pleas, of one specification of attempted sexual assault of a child, in violation of Article 80, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 880.

Appellant asserts one assignment of error: his court-martial was tainted by actual and apparent unlawful command influence [UCI] stemming from his chain of command forbidding members of the command from talking with defense attorneys.[1] We find no prejudicial error and affirm.

## I. BACKGROUND

In February 2020, Appellant was apprehended at an on-base residence. He arrived at the residence with condoms and was planning to meet a 14-year-old girl for sex. Unbeknownst to him, the 14-year-old girl with whom he had online communications was actually an undercover military law enforcement agent.

Appellant was assigned to Navy Information Operations Command [NIOC] Hawaii, whose primary mission is intelligence operations. Much of the command's work is classified or of a sensitive nature. Appellant was assigned to the N3A/N3B division within NIOC Hawaii, and stood the command's battle watch.

One of the division chiefs within N3A/N3B was Chief Cryptologic Technician (Collection) [CTRC] (E-7) Wilson.[2] He worked with Appellant on the command's battle watch from February 2019 to February 2020. The two Sailors had served together as E-6s, and CTRC Wilson had continuing contact with Appellant while he was in pretrial confinement.

_____

[1] The assignment of error was raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[2] All names used in this opinion, except those of the judges, counsel, and Appellant are pseudonyms.

One morning in April 2020, CTRC Wilson received a call while he was teleworking at home. The call was from a defense investigator who was seeking character information about a Sailor, Cryptologic Technician (Collection) Third Class [CTR3] (E-4) Sierra, who had previously worked for him in N3A/N3B and who was then assigned to another department at NIOC Hawaii. CTRC Wilson was caught off-guard by these questions because he was not aware that CTR3 Sierra was involved in any legal proceeding. Despite this, CTRC Wilson provided the investigator his opinion regarding CTR3 Sierra, who was a potential government witness in a court-martial unrelated to Appellant's case. After that phone conversation ended, CTRC Wilson called his senior chief to report the matter. The senior chief told CTRC Wilson that instead of speaking with the investigator, he should have referred him to the command's legal office. The senior chief also told CTRC Wilson to email the command master chief and the staff judge advocate [SJA] to summarize his conversation with the investigator, and CTRC Wilson complied.

Command Master Chief [CMC] Charlie (E-9), the Command Master Chief of NIOC Hawaii, received notifications that morning that some of the chiefs at the command were getting calls about one of their Sailors from someone purporting to be a defense counsel. CMC Charlie was concerned because usually the command's SJA would let him know when defense counsel might call members of the command. He understood the caller was "looking for dirt"[3] about the Sailor in question, CTR3 Sierra, and he thought that the caller could be a foreign intelligence officer.

Because he was concerned about the calls and was unable to verify that they were legitimate inquiries, CMC Charlie sent a message on the "Slack" web application to quickly and forcefully get the message out to the members of the Chief Petty Officers' [CPO] Mess. The message stated:

> If a Defense Attorney calls you about one of your Sailors (or any Sailor at NIOC Hawaii), you are not authorized to talk to them. You will point them to our Legal Office at [phone number], then inform your [Department Leading Chief Petty Officer] & [Senior Enlisted Leader], who will pass it on to me.

---

[3] R. at 26.

> If you do not know what I'm talking about, good, it doesn't apply to you. Conversation already had with the person it applies to.[4]

Upon receipt of CMC Charlie's message, Chief Cryptologic Technician (Interpretive) [CTIC] (E-7) Smith, who along with CTRC Wilson, was one of the co-division chiefs for N3A/N3B, forwarded it to Appellant's entire division.

When the defense investigator called back to have CTRC Wilson speak with the defense attorney in the case involving CTR3 Sierra, CTRC Wilson told him that he did not feel comfortable doing so and referred him to the command's SJA.

Shortly after sending the Slack message to the CPO Mess, CMC Charlie learned from the NIOC Hawaii SJA that the calls from the defense investigator were legitimate and that command personnel were authorized to speak with defense or government counsel if they wanted to. CMC Charlie then called CTRC Wilson to clarify that he could speak to any defense counsel if he wished to do so. Additionally, the NIOC Hawaii SJA both emailed and called CTRC Wilson to ensure that he understood that he was permitted to speak with defense counsel if he wanted to.

Approximately three hours after he sent his first message to the CPO Mess, CMC Charlie sent out the following message to that group on Slack:

> I need to correct what I put out earlier. JAG gave me feedback that no one can be "denied" from talking to an attorney about a Sailor. That is illegal to do so. Just want to be clear about that.
>
> However, if you are uncomfortable doing so, you are highly encouraged to point them to the Legal office.
>
> Appreciate you all and thanks to everyone for taking care of our Sailors (and each other) during this global crisis.[5]

The same day, when the defense investigator called back again, CTRC Wilson agreed to speak to the defense counsel and to provide character testimony favorable to the defense in the case involving CTR3 Sierra.

After receiving the second message from CMC Charlie, CTRC Wilson and CTIC Smith posted the corrected guidance in a pass-down log for watch-

---

[4] App. Ex. III at 21.

[5] *Id.* at 31.

standers, held a divisional training on the issue, and made phone calls to the Leading Petty Officers of their division to ensure that everyone within N3A/N3B received the clarification that all were authorized to speak to defense attorneys.

In June 2020, the Commanding Officer of NIOC Hawaii sent an email to all hands at the command, educating them on what UCI is. She also stated that Sailors are authorized to speak to counsel or provide character witness testimony, and that the command was supportive of them doing so.

In Appellant's case, CTRC Wilson did speak to Trial Defense Counsel [TDC], and was asked by TDC to testify on Appellant's behalf. However, he was unsure whether he wanted to do so. He explained during testimony on Appellant's motion to dismiss due to UCI that his hesitation to testify was not related to CMC Charlie's message to the CPO Mess. Rather, his reluctance was due to the nature of the allegations against Appellant.

Prior to Appellant's entrance into a plea agreement with the convening authority, he had requested the production of three character witnesses at trial. One witness was his wife. The second witness was a senior chief from NIOC Hawaii, with whom Appellant had also served at two previous commands. The third witness was a chief who had previously worked with him at NIOC Hawaii. The Government agreed to produce each of these witnesses for testimony at trial.

Ultimately, Appellant pleaded guilty to one specification of attempted sexual assault of a child. Pursuant to his plea agreement with the convening authority, Appellant "specifically agree[d] to waive all motions except those that are non-waivable pursuant to [Rule for Courts-Martial] 705(c)(1)(B) or otherwise."[6]

CTRC Wilson did not testify during Appellant's sentencing proceeding.

## II. DISCUSSION

### A. Standard of Review and the Law

We review allegations of UCI de novo.[7] Article 37(a), UCMJ, prohibits UCI. This prohibition includes attempts to interfere with access to witness-

---

[6] App. Ex. XV at 4.

[7] *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013).

es.[8] There are two types of UCI that can arise in the military justice system: actual UCI and apparent UCI.[9] Actual UCI occurs when there is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case.[10] Apparent UCI occurs when, "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding."[11]

The defense has the initial burden of raising the issue of UCI.[12] To raise the issue, the defense must (1) show facts which, if true, constitute UCI; (2) show that the proceedings were unfair; and (3) show that UCI was the cause of the unfairness.[13] "The threshold for raising the issue at trial is low, but more than mere allegation or speculation."[14] The evidentiary standard is "some evidence."[15] Thus, at trial, "the accused must show facts which, if true, constitute [UCI], and that the alleged [UCI] has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings."[16]

"Once the issue is raised at the trial level, the burden shifts to the Government, which may either show that there was no UCI or show that the UCI will not affect the proceedings."[17] The burden of disproving the existence of UCI or proving that it did not affect the proceeding does not shift until the defense meets the burden of production.[18] If the defense meets that burden, then UCI is raised at the trial level, and consequentially, a presumption of prejudice is created.[19] To affirm in such a situation, a reviewing court must

---

[8] *United States v. Douglas*, 68 M.J. 349, 354 (C.A.A.F. 2010).

[9] *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017).

[10] *Id.*

[11] *Id.* at 249 (quoting *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006)).

[12] *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999).

[13] *Id.*

[14] *Id.* (citation omitted).

[15] *Id.* (citation omitted).

[16] *Id.* (citations omitted).

[17] *Id.* (citation omitted).

[18] *United States v. Ayala*, 43 M.J. 296, 299 (C.A.A.F. 1995).

[19] *Douglas*, 68 M.J. at 354.

be convinced beyond a reasonable doubt that the UCI had no prejudicial effect on the court-martial.[20] "[P]rejudice is not presumed until the defense produces evidence of proximate causation between the acts constituting [UCI] and the outcome of the court-martial."[21]

In *United States v. Boyce*, the Court of the Appeals for the Armed Forces [CAAF], reversed the findings and sentence in a sexual assault case on the basis of apparent UCI, despite finding no prejudice suffered by the appellant.[22] In dissent, Judge Ryan expressed her disagreement with the majority, reasoning, "I posit that Congress had good reason to tether appellate relief to Article 59(a)'s requirement of prejudice to the accused . . . ."[23]

Less than three years after CAAF issued its opinion in *Boyce*, Congress amended Article 37, UCMJ, ("Command influence") to require a showing of material prejudice to the substantial rights of the accused before a finding or sentence of a court-martial may be held incorrect on the ground on a violation of that section.[24] The effective date of this amendment to Article 37, UCMJ, was 20 December 2019.[25]

Acts of apparent UCI committed prior to the effective date of the revision to Article 37, UCMJ did not require a showing of prejudice to an accused to constitute a meritorious claim of UCI.[26] Under the prior framework, once an accused showed "some evidence" of UCI, the burden shifted to the government to prove beyond a reasonable doubt that either a) the predicate facts proffered by the accused did not exist, or b) the facts as presented did not constitute unlawful command influence.[27] If the government was unable to

---

[20] *Id.*

[21] *Biagase*, 50 M.J. at 150.

[22] *Boyce*, 76 M.J. at 253.

[23] *Id.* at 256.

[24] "No finding or sentence of a court-martial may be held incorrect on the ground of a violation of this section unless the violation materially prejudices the substantial rights of the accused." 10 U.S.C. 837(c).

[25] National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, § 532(c), 133 Stat. 1361 (2019).

[26] *United States v. Proctor*, ___ M.J. ___, No. 20-0340, 2021 CAAF LEXIS 509 at *13 (C.A.A.F. Jun. 2, 2021). The alleged act of UCI in *Proctor* occurred prior to the effective date of the revision to Article 37(c), UCMJ.

[27] *United States v. Bergdahl*, 80 M.J. 230, 234 (C.A.A.F. 2020) (internal citations omitted).

meet that burden, then it was required to prove beyond a reasonable doubt that the UCI "did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, would not harbor a significant doubt about the fairness of the proceeding."[28] Under this analysis, the only prejudice required to be shown was that done to the "public's perception of the military justice system as a whole."[29] Yet, even under the prior framework, a significant factor in determining whether the UCI created an intolerable strain on the public's perception of the military justice system was still whether the "appellant was not personally prejudiced by the [UCI], or that the prejudice caused by the [UCI] was later cured."[30]

As our sister court recently observed in *United States v. Alton*, the change to Article 37, UCMJ, at issue seems to vitiate the prior apparent UCI "intolerable strain / disinterested observer" jurisprudence in favor of Judge Ryan's approach in her dissent in *Boyce*. In it, she argued that CAAF's apparent UCI cases (including the *Boyce* majority) were in tension with the Article 59(a), UCMJ, prejudice requirement.[31]

Finally, military courts draw a distinction between UCI during the accusatorial process (i.e., the preferral, forwarding, and referral of charges) and UCI during the adjudicative stage (i.e. interference with witnesses, judges, members, and counsel).[32] An accused forfeits claims of accusatory UCI if they are not raised at trial.[33] CAAF has declined to apply waiver of UCI arising in the adjudicative process by the mere "failure to object or call the matter to the military judge's attention."[34] However, an appellant may "initiate an

---

[28] *Id.* (internal quotation and citation omitted).

[29] *Proctor*, __ M.J. at __, 2021 CAAF LEXIS 509 at *13 (quoting *Boyce*, 76 M.J. at 248).

[30] *Id.* (quoting *Boyce*, 76 M.J. at 248 n.5).

[31] *United States v. Alton*, No. ARMY 20190199, 2021 CCA LEXIS 269 *13-14 n.5 (Army Ct. Crim. App. Jun. 2, 2021) (unpublished). *See Boyce*, 76 M.J. at 256 (Ryan, J., dissenting).

[32] *United States v. Weasler*, 43 M.J. 15, 17–18 (C.A.A.F. 1995).

[33] *United States v. Drayton*, 45 M.J. 180, 182 (C.A.A.F. 1996).

[34] *United States v. Baldwin*, 54 M.J. 308, 310 n.2 (C.A.A.F. 2001); *see also Douglas*, 68 M.J. at 356 n.7 (considering appellant's "acquiescence and silence" on issues of waiver but noting that "this Court has not applied the doctrine of waiver where unlawful command influence is at issue."(citing *United States v. Johnston*, 39 M.J. 242, 244 (C.A.A.F. 1994)); *Johnston*, 39 M.J. at 244 (noting "[UCI] is not waived by failure to raise at trial.")

affirmative and knowing waiver of an allegation of [UCI] . . . in order to secure the benefits of a favorable [plea] agreement."[35] "[W]aiver is the intentional relinquishment or abandonment of a known right."[36] As a general matter, when an appellant "intentionally waives a known right at trial, it is extinguished and may not be raised on appeal."[37]

## B. Appellant Waived the Issue of UCI in His Plea Agreement

We are satisfied that Appellant affirmatively, knowingly, and consciously waived potential UCI issues and remedies in his case. TDC and Appellant were aware of the facts and circumstances surrounding CMC Charlie's message to the CPO Mess, which was later forwarded to Appellant's entire division. Indeed, Appellant brought a motion to dismiss the charge and specifications based on that occurrence. Approximately one week after the military judge issued her ruling denying the Defense motion to dismiss, Appellant entered into a plea agreement with the convening authority that contained a "waive all waivable motions" provision, entered unconditional pleas of guilty, and in no way sought to preserve the UCI issue for appeal.

During the guilty plea proceeding, the military judge confirmed that Appellant read over his plea agreement carefully and discussed it with TDC before he signed it. Appellant also confirmed in open court that he understood the terms of his agreement. He agreed that both parties, including himself, would be bound by the terms of the agreement. And, although the military judge did not specifically address the "waive all waivable motions" provision with him, Appellant declined to have the military judge explain it to him when she asked him, "are there any other paragraphs or specially negotiated provisions that you want me to cover with you in more depth?"[38] Thus, we find that with regard to the issue of waiver of the motion to dismiss on the grounds of UCI that he had previously raised, Appellant intentionally relinquished a known right, as opposed to merely demonstrated "acquiescence and silence" to potential UCI in his case.[39]

---

[35] *Weasler*, 43 M.J. at 19.

[36] *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (internal quotations and citations omitted).

[37] *Id.*

[38] R. at 110.

[39] *See Douglas*, 68 M.J. at 356.

We also considered whether we should exercise our authority to consider Appellant's UCI claim under Article 66(c), UCMJ, despite his waiver.[40] Given the facts and circumstances presented here, we decline to do so.

## C. Assuming Arguendo Appellant Did Not Waive the Issue of UCI, the Government Has Established Beyond a Reasonable Doubt That the Facts Do Not Constitute Actual UCI

Assuming arguendo that Appellant did not waive UCI at the trial level, he has satisfied his initial burden of showing some evidence which, if true, would constitute UCI. Specifically, CMC Charlie's initial message, sent to the NIOC Hawaii CPO Mess and subsequently forwarded to Appellant's entire division, said that command personnel were not authorized to speak with defense counsel who called. However, the Government has demonstrated beyond a reasonable doubt that the facts do not constitute actual UCI.

Certainly, CMC Charlie's message to the CPO Mess was poorly worded. At first blush, the message appeared to interfere with the rights of Sailors accused of offenses whose defense counsel were appropriately attempting to interview potential witnesses. Yet, the Government has established that this message was not an improper manipulation of the criminal justice process. Although the message stated that NIOC Hawaii personnel were not authorized to speak with defense attorneys who called, the very next sentence in the message directed command personnel to refer any such inquiry to the command's legal office. We are persuaded beyond a reasonable doubt, as was the military judge, that CMC Charlie's intent in sending such a quick and strong message was to attempt to stop the impact of unusual inquiries made to members of the command that he could not confirm were legitimate inquiries. These inquiries were unusual to him because typically the SJA would give the command advance notification if counsel may be calling. By instructing personnel to refer any such inquiries to the legal office, CMC Charlie clearly demonstrated that he was not trying to improperly manipulate the criminal justice process. Rather, he was trying to ensure the proper criminal justice process was being followed without compromising NIOC Hawaii's personnel or its mission.

Thus, that portion of CMC Charlie's message directing inquiries to the legal office was a reasonable action to ensure that any unusual calls to the command were funneled to the appropriate place where they could be verified. Such action would alleviate concerns that the caller may be a foreign

---

[40] *See United States v. Chin*, 75 M.J. 220, 222–24 (C.A.A.F. 2016).

intelligence officer or that attempts to obtain derogatory information about CTR3 Sierra were being made for an otherwise nefarious purpose. Once the legal office became involved, the confusion regarding who was making these phone calls to the command and why they were making them could be resolved. The command was then able to ensure that command members were aware that the calls from the person purporting to be calling on behalf of a defense counsel were legitimate and the rights of an accused to obtain witnesses and evidence would be protected.

Even if CMC Charlie's actions could be considered UCI, the Court finds the Government has established beyond a reasonable doubt that any UCI did not prejudice Appellant's court-martial. Appellant argues that CTRC Wilson's willingness to provide character testimony on his behalf was chilled by CMC Charlie's initial message which was subsequently forwarded to his entire division by one of his division's chiefs. However, we are persuaded, consistent with CRTC Wilson's own testimony on the Defense motion to dismiss, that his hesitation in testifying for the Defense was not because of anything CMC Charlie said or did, but rather due to the nature of Appellant's charged offenses. Our conclusion on this point is strengthened by the fact that CTRC Wilson ultimately spoke to the defense counsel and agreed to provide character testimony favorable to the defense in the unrelated case that involved CTR3 Sierra.

Appellant did not offer any evidence that showed with specificity what other Defense witnesses besides CTRC Wilson would have testified to on his behalf but for the circumstances of the distribution of CMC Charlie's initial message to the CPO Mess. Moreover, we are convinced beyond a reasonable doubt that the command's corrective actions removed any taint of UCI from Appellant's access to witnesses and evidence within his division and at NIOC Hawaii as a whole. Thus, any claim of actual UCI that survived his waiver at the trial level fails before this Court.

**D. Assuming Arguendo Appellant Did Not Waive UCI, No Remedy Is Available to Him Under the Doctrine of Apparent UCI Due to a Lack of Prejudice**

We find that the Government has established beyond a reasonable doubt that Appellant did not experience any material prejudice to his substantial rights. As discussed above, we are persuaded that CTRC Wilson's hesitation in testifying for the Defense in this case was not because of anything CMC Charlie said or did, but rather the nature of Appellant's charged offenses. Additionally, the Government has demonstrated beyond a reasonable doubt that the corrective actions taken by the command to address the distribution of CMC Charlie's message, which on its face prohibited talking to

defense counsel who called, removed any taint of UCI from Appellant's case. At all relevant times in this case, the revised Article 37, UCMJ, was in effect. Therefore, because there has been no showing of material prejudice to the substantial rights of Appellant, we are statutorily barred from holding the findings or sentence in his case to be incorrect on the grounds of apparent UCI.[41]

**E. Assuming Arguendo Appellant Did Not Waive UCI and That the Revised Article 37 Did Not Apply, We Find No Intolerable Strain on the Military Justice System**

Even if we were not so barred, we are confident beyond a reasonable doubt that such influence "did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding."[42] Here, in an unrelated case, after a defense investigator cold-called potential witnesses at Appellant's command whose primary mission involves intelligence operations, the command master chief sent a message that prohibited command members from speaking to defense attorneys who called and directed that such calls be referred to the command's legal office. This action was motivated by concerns that the calls were placed by an unverified person with unknown motives. Within approximately three hours, the command master chief corrected his initial message, and the command took numerous further steps to ensure that all hands understood that they were permitted, indeed encouraged, to speak with defense counsel if they chose to do so.

We easily conclude in this particular case a finding of apparent UCI is not warranted because there was no intolerable strain on the military justice system.[43] This conclusion is predicated on all the relevant facts of this case, regardless of whether the various stages of the court-martial are viewed individually or cumulatively.[44] However, due to the facts and circumstances of this case, only the guilty plea and sentencing phases of Appellant's court-martial could reasonably be expected to have been affected by CMC Charlie's message to the CPO Mess and the further distribution of that message to the

---

[41] *See* 10 U.S.C. 837(c).

[42] *Proctor*, ___ M.J. ___, 2021 CAAF LEXIS 509 at *14 (quoting *Bergdahl*, 80 M.J. at 234).

[43] *See Bergdahl*, 80 M.J. at 239.

[44] *See id.*

members of Appellant's division. Therefore, we confine our analysis to those two stages.

Appellant chose to plead guilty to the offense of attempted sexual assault of a child. In doing so, he explicitly stated in open court that he was voluntarily pleading guilty because he was in fact guilty.[45] During a substantial plea colloquy, Appellant explained in detail how he met a person whom he believed to be a 14 year-old female military dependent on an online application, and that their conversations continued through back-and-forth text messages. He admitted in open court that, although the messages were initially benign, they progressed to flirtation and innuendo, leading to agreeing to meet at her on-base residence for sex while her single-parent mother was away for the night. The conversations between Appellant and the undercover agent included the need for him to bring condoms and the fact that he had previously undergone a vasectomy. Based on Appellant's own words, no impartial observer would conclude it was the actions of the command master chief and other members of his chain of command that caused him to plead guilty. Instead, it was the strength of the Government's evidence and the beneficial plea agreement Appellant received which caused him to take that step.[46] Therefore, no claim of unfairness regarding the guilty plea phase of the court-martial proceedings can prevail.[47]

With regard to the sentencing stage of the proceedings, Appellant obtained the benefit of a plea agreement that limited his confinement exposure to 36 months, well below the statutory maximum of 20 years for the offense to which he pleaded guilty. As additional consideration for Appellant's plea of guilty, the convening authority agreed that only a bad conduct discharge would be adjudged, as opposed to a dishonorable discharge, which is otherwise the mandatory minimum punishment for the offense of attempted sexual assault of a child. Under the plea agreement, the convening authority also permitted Appellant to plead not guilty to the charged offense of attempted sexual abuse of a child (indecent communication), and the Government did not go forward on that specification. Moreover, due to the multiple corrective measures taken by NIOC Hawaii command leadership to address the initial message sent by CMC Charlie, we are satisfied that no potential defense witnesses for sentencing were chilled from participating in Appel-

---

[45] R. at 110.

[46] *See Bergdahl*, 80 M.J. at 242.

[47] *See id.* at 244.

lant's case. Therefore, we find no unfairness regarding the sentencing phase of the court-martial proceedings.

The totality of these circumstances makes it clear beyond a reasonable doubt that the action of CMC Charlie in sending his initial message to the NIOC Hawaii's CPO Mess, and the action of CTIC Smith who forwarded that message to Appellant's entire division, "did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of these proceedings."

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[48]

The findings and sentence are **AFFIRMED**.

Senior Judge STEPHENS and Judge DEERWESTER concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[48] Articles 59 & 66, UCMJ.