# United States Navy–Marine Corps Court of Criminal Appeals

Before
HOLIFIELD, DEERWESTER, and MYERS
Appellate Military Judges

_____

**UNITED STATES**
*Appellant*

**v.**

**Eric S. GILMET**
Hospital Corpsman Chief Petty Officer (E-7), U.S. Navy
*Appellee*

**No. 202200061**

_____

Argued: 29 June 2022—Decided: 15 August 2022

Appeal by the United States Pursuant to Article 62, UCMJ

Military Judge:
Hayes C. Larsen

Arraignment 24 February 2020 before a general court-martial convened at Marine Corps Base Camp Lejeune, North Carolina.

For Appellant:
*Lieutenant Megan E. Martino, JAGC, USN* (argued)
*Major Kerry E. Friedewald, USMC* (on brief)

For Appellee:
*Lieutenant Kristen R. Bradley, USCG* (argued)
*Lieutenant Megan E. Horst, JAGC, USN* (on brief)

Senior Judge HOLIFIELD delivered the opinion of the Court, in which Senior Judge Deerwester and Judge Myers joined.

―――――――――――――――

This opinion does not serve as binding precedent, but may be
cited as persuasive authority under NMCCA Rule of Appellate
Procedure 30.2.

―――――――――――――――

HOLIFIELD, Senior Judge:

This case is before us on appeal pursuant to Article 62, Uniform Code of
Military Justice [UCMJ].[1] The Government alleges the military judge abused
his discretion in dismissing all charges with prejudice. More specifically, Ap-
pellant asserts three assignments of error (AOEs): (1) the military judge erred
when he considered counsel's asserted conflicts of interest before shifting the
burden to the United States and found Appellee was prejudiced by the volun-
tary release of counsel; (2) the military judge erred in finding actual unlawful
command influence [UCI] when the government provided evidence proving be-
yond a reasonable doubt that Colonel [Col] Sierra's[2] comments would have no
effect on the court-martial; and (3) the military judge erred in conducting an
apparent UCI analysis and in finding apparent UCI. We find error, vacate the
military judge's ruling, and remand for further proceedings not inconsistent
with this opinion.

## I. BACKGROUND[3]

Appellee was charged at a general court-martial with violation of a lawful
order, involuntary manslaughter, obstruction of justice, and negligent homi-
cide, in violation of Articles 92, 119, 131b, and 134, UCMJ,[4] and was arraigned

―――――――――――――――

[1] 10 U.S.C. § 862(a)(1)(A).

[2] All names in this opinion, other than those of Appellee, the judges, and appellate
counsel, are pseudonyms.

[3] Unless otherwise noted, the background facts are summarized from the military
judge's findings of fact. *See* App. Ex. CIX.

[4] 10 U.S.C. §§ 892, 919, 931b, and 934.

on 24 February 2020.[5] On 9 February 2022, the military judge dismissed all charges with prejudice based on both actual and apparent UCI.

## A. Appellee's Counsel and Preparations for Trial

Appellee's lead counsel, Mr. Victor, has represented Appellee as civilian defense counsel [CDC] since January 2019. In March 2020, Appellee requested as his Individual Military Counsel [IMC]  Captain [Capt] Tango. This request was approved the following month, accompanied by the excusal of Appellee's detailed defense counsel and the detailing of Capt Romeo as Appellee's new assistant defense counsel [ADC]. Each of the three counsel proceeded to prepare different aspects of Appellee's case, interviewing specific witnesses as appropriate.

After extensive delays due to the impacts of COVID-19, the trial was scheduled to begin in January 2022.

## B. Colonel Sierra's Visit and Comments

Col Sierra, as Deputy Director of Community Management and Oversight of the Marine Corps' Judge Advocate Division [JAD], was responsible for managing the assignment process for all Marine judge advocates. While he did not have final say as to what assignments Marine judge advocates would receive, he did supervise preparation of a proposed assignment slate (listing officers matched to specific billets) on which the Staff Judge Advocate to the Commandant of the Marine Corps [SJA to CMC] would make a final recommendation. This recommendation would form the basis for final assignment decisions made by the office of Marine Corps Manpower Management.

Col Sierra was serving in this capacity in November 2021 when he and other members of JAD traveled to Marine bases in North and South Carolina to meet with judge advocates assigned there. On 18 November 2021, Col Sierra met with personnel assigned to Camp Lejeune's Defense Service Office [DSO]. Numerous defense counsel, including Capt Tango, were in attendance. Notably, Capt Romeo was not.

---

[5] Other than noting the serious nature of the charges, that Appellant allegedly committed the offenses while assigned to a Marine unit, and that two Marines are facing courts-martial for related, equally serious offenses, the underlying facts of the charged offenses are not relevant to our present analysis.

After introducing himself and explaining his role within JAD, Col Sierra described pending legislative changes that will affect the practice of military justice. Capt Tango, curious about the independence of a new position wherein a senior prosecutor, not a commander, will make referral decisions in certain cases, asked what was being done to minimize any effect of improper influences on those referral decisions. As an example, Capt Tango referenced the current practice of having DSO leadership prepare fitness reports for the defense counsel under their responsibility "so as to protect the defense attorneys from outside influences."[6] Here is where the discussion went off the rails.

Col Sierra stated that defense counsel "may think they are shielded, but they are not protected," calling such protection a "legal fiction." Col Sierra then turned to face Capt Tango and, looking him in the eye, said: "Captain [Tango], I know who you are, and what cases you are on, and you are not protected." He continued, "the FITREP process may shield you, but you are not protected. Our community is small and there are promotion boards and the lawyer on the promotion board will know you," or words to that effect. As examples, he referenced judge advocates who had served for extended periods as defense counsel on high-visibility cases, noting that spending five or six years in a defense billet could negatively affect a judge advocate's chances of promotion.

Capt Tango interpreted Col Sierra's comments as being directed at him and concerning his representation of Appellee. He subsequently became concerned that his role as Appellee's IMC could negatively impact both his promotion prospects and the billets to which he would be assigned. When Capt Tango relayed the encounter to Appellee, the latter began to question his IMC's undivided loyalty to him and his defense.

While Capt Romeo was not at the meeting with Col Sierra, he believed the latter's comments applied equally to him. Like Capt Tango, Capt Romeo became concerned that his zealous representation of Appellee would put his career opportunities at risk. Hearing this, Appellee's doubt as to his IMC's loyalty now extended to his ADC's, as well. [7]

## C. Remedial Actions and Motion to Dismiss Charges

---

[6] App. Ex. LXXXVI at 3.

[7] App. Ex. LXXXVI, encl. 12.

Upon learning of Col Sierra's comments, the SJA to the CMC, Major General [MajGen] Bravo, immediately removed Col Sierra from his position at JAD and, on 30 November 2021, ordered an investigation. The investigating officer [IO] concluded that, while Col Sierra's comments to defense counsel were "ill-advised and lacked proper context and background," the matter did not merit further action.[8]

Over the next few weeks, however, Col Sierra put remarkable effort into digging his hole deeper. He provided a statement to the trial counsel in two related courts-martial, claiming he neither knew Capt Tango nor recalled speaking with him. This claim was directly refuted by texts in which Col Sierra, just hours before the 18 November 2021 DSO meeting, discussed Capt Tango with a subordinate at JAD. The discussion concerned Capt Tango's next assignment: he had been selected for a coveted, highly competitive in-house professional military education program. Col Sierra noted in these texts that he thought Capt Tango may ask to remain in his current billet.

Col Sierra also indicated in his statement to trial counsel that, were he called to testify as a witness in any criminal proceeding, he intended to invoke his right to remain silent. He reiterated this intent in a subsequent statement. Accordingly, he never testified under oath regarding his comments.

On 10 December 2021, Appellee's CDC, IMC, and ADC, jointly signed and submitted a motion to dismiss all charges with prejudice based on actual and apparent UCI.[9] Enclosures to the motion included, inter alia, affidavits of Appellee and his two uniformed counsel describing the deteriorated state of their attorney-client relationships.

A week later, MajGen Bravo declared in an affidavit that Col Sierra's statements at the DSO meeting were improper as they do not comport with MajGen Bravo's views or guidance. He indicated that Col Sierra would no longer be involved with the detailing and assignment process. MajGen Bravo

---

[8] In his ruling on the motion to dismiss, the military judge noted: "The Court is reluctant to mention the findings and recommendations of the IO, as they are not binding on any of the issues this Court must address and resolve. The Court highlights this investigation to show that (a) it was ordered (b) it was completed (c) to utilize the investigations enclosures for facts that may not have been previously provided by the parties in the UCI litigation and (d) to address the curative efforts by the Government." App. Ex. CIX, at 6, n. 14. We agree with and adopt this limited use of the investigation.

[9] App. Ex. LXXXVI.

went on to praise defense work as vital to success of the military justice system. He further encouraged zealous advocacy and assured counsel that service as a defense counsel will in no way be detrimental to one's career, citing the Marine Corps' need to develop litigation expertise.

Along with MajGen Bravo's affidavit, trial counsel submitted affidavits from various JAD and Military Personnel Law Branch officials detailing the inability of anyone in Col Sierra's role to affect promotion board membership. Trial counsel also provided the official biographies of the past eight SJAs to the CMC, noting that seven of them had served in defense billets during their careers.[10]

### D. Release of Counsel

At an Article 39(a), UCMJ session on 21 December 2022, scheduled to address the UCI motion, the military judge first took up the attorney conflict issue. Through a brief series of leading questions,[11] he asked IMC and ADC if, even knowing MajGen Bravo's remedial actions and statements, each believed there still existed a conflict of interest. Both counsel, having spoken with their respective state licensing authorities and conflict-free supervisory counsel, affirmed that they believed a conflict of interest did exist. When asked if they were seeking to be removed from the case, each answered in the affirmative.

Rather than analyze the issue as a motion for withdrawal for good cause under Rule for Courts-Martial [R.C.M.] 506(c), however, the military judge proceeded to ask Appellee whether he consented to the release of his military counsel. He correctly advised Appellee of R.C.M. 506(c)'s meaning, saying, "your counsel may only be excused with your express permission or by the military judge upon application for withdrawal . . . for good cause shown."[12] But, instead of obtaining Appellee's clear, voluntary consent for release of his counsel or finding good cause for their non-consensual release, the military judge did neither.

---

[10] App. Ex. LXXXIII.

[11] The entire inquiry regarding both counsel fills less than two transcribed pages. R. at 209-10.

[12] R. at 211.

Appellee described the choice whether to release his counsel as unfair, and how he "didn't do anything wrong to be put in the situation."[13] After a brief recess in which Appellee consulted with conflict-free counsel, he said, "It's a very difficult decision, but I do consent."[14] The military judge excused the IMC and ADC. Appellee then stated that he wished to be represented by his CDC and two new military counsel.

Believing he had settled the conflict of interest matter, the military judge next turned to the UCI motion itself.[15] He first asked CDC whether the release of Appellee's military counsel had mooted the UCI issue. The CDC argued that it did not, as the choice made by his client—a choice created by the Government—was one between two evils. In effect, it was not a voluntary choice.

The military judge agreed with CDC's description of the situation, referring to Appellee's decision as a "Hobson's choice."[16] He then asked whether Appellee's consenting to his counsel's release "created a material prejudice that cannot be cured, or had it mooted the issue? That's how I see it. Very binary. It's either mooted the issue, or it is exhibit A to materially prejudicing the accused."[17]

## E. Military Judge's Ruling

In his ruling on the Defense Motion to Dismiss for UCI, the military judge summed up the situation as follows:

> [A] senior judge advocate who occupied a position of authority over the futures of young judge advocates made threatening comments to a young judge advocate about his career while this

---

[13] R. at 212.

[14] R. at 213.

[15] Appellee consented to litigating the UCI motion with only his CDC present.

[16] R. at 265. "[A]n apparently free choice where there is no real alternative" or "the necessity of accepting one of two or more equally objectionable alternatives." Merriam-Webster, *Hobson's Choice*, http://www.merriam-webster.com/dictionary/Hobson'schoice (last visited Jul. 28, 2022).

[17] R. at 270.

young judge advocate was assigned as IMC to a HIVIS case, creating an intolerable tension and conflict between an accused and his specifically requested military counsel.[18]

Furthermore,

Capt Tango was faced with the choice to zealously represent this client and sacrifice the potential for advancement in the USMC or protect his nascent career. This in turn created a difficult choice for [Appellee]; he must either proceed with a conflicted attorney or effectively be deprived of his choice of individually chosen military counsel given the conflict the government created. . . . This really was not a choice.[19]

Having framed the issue thusly, and having already found that Col Sierra's comments materially prejudiced Appellee's substantial rights, it is not surprising that the military judge found both actual and apparent UCI and proceeded to grant Appellee's motion to dismiss all charges with prejudice.

Additional facts necessary to resolve the AOEs are addressed below.

## II. DISCUSSION

### A. Standard of Review

"In an Article 62, UCMJ, appeal, this Court reviews the military judge's decision directly and reviews the evidence in the light most favorable to the party which prevailed at trial," which in this case is Appellee.[20] We review allegations of UCI de novo, accepting a military judge's findings of fact unless clearly erroneous.[21]

---

[18] App. Ex. CIX at 11 (internal footnote omitted).

[19] *Id.* at 14, 17.

[20] *United States v. Becker*, 81 M.J. 483, 488 (C.A.A.F. 2021) (internal citations omitted).

[21] *United States v. Barry*, 78 M.J. 70, 77 (C.A.A.F. 2018).

### B. Unlawful Command Influence

The prohibition against UCI stems from Article 37(a), UCMJ, which provides: "No person subject to [the UCMJ] may attempt to coerce or, by any unauthorized means, influence the action of a court-martial . . . or any member thereof . . . ."[22] Our superior Court has long held that UCI is the "mortal enemy of military justice."[23]

There are two types of UCI that can arise in the military justice system: actual and apparent.[24] Actual UCI occurs when there is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case.[25] Apparent UCI occurs when, "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding."[26]

#### *1. Apparent UCI*

We address apparent UCI first, as the facts make it more easily dispensed with.

Appellant argues that the 2019 amendment to Article 37, UCMJ, eliminated apparent UCI as a basis for appellate relief. Effective 20 December 2019, the relevant new language in Article 37 states: "No finding or sentence of a court-martial may be held incorrect on the ground of a violation of this section [ i.e., UCI] unless the violation materially prejudices the substantial rights of the accused."[27] We need not address whether the issue before this court involves a "finding or sentence of a court-martial," as we find that, even if apparent UCI is still a viable basis for relief, there was no apparent UCI here.

---

[22] 10 U.S.C. § 837.

[23] *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986).

[24] *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017).

[25] *Id.*

[26] *Id.* at 249 (quoting *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006)).

[27] 10 U.S.C. 837(c).

Whether the Government has created an appearance of UCI is determined objectively.[28] The focus is on "the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public. Thus, the appearance of [UCI] will exist where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt as to the fairness of the proceeding."[29]

To establish apparent UCI, Appellee bore the initial burden of demonstrating "some evidence" of UCI. Once he had done so, the burden shifted to the government to prove beyond a reasonable doubt that either a) the predicate facts proffered by the accused did not exist, or b) the facts as presented did not constitute unlawful command influence.[30] If the Government was unable to meet either of these tasks, then it was required to prove beyond a reasonable doubt that the UCI "did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer would not harbor a significant doubt about the fairness of the proceeding."[31]

We expect that "an objective, disinterested observer" will likely find Col Sierra's comments to Capt Tango highly disturbing. They were as shocking as they were incorrect. But it is that very demonstrable (and demonstrated) incorrectness that saves these proceedings from the appearance of UCI. The "facts and circumstances" in the present case include the evidence the Government provided to show that Col Sierra's comments were patently untrue, as well as that Capt Tango had been selected for highly valued professional military training. If such an observer is "fully informed" of this evidence, any doubt as to the fairness of the proceeding becomes both unlikely and unreasonable. Thus, we conclude the military judge clearly erred in finding apparent UCI.

---

[28] *Lewis*, 63 M.J. at 415 (citation omitted).

[29] *Id.*

[30] *United States v. Bergdahl*, 80 M.J. 230, 234 (C.A.A.F. 2020) (internal citations omitted).

[31] *Id.* (internal quotation and citation omitted).

*2. Actual UCI*

The defense has the initial burden of raising the issue of UCI.[32] "The threshold for raising the issue at trial is low, but more than mere allegation or speculation."[33] The evidentiary standard is "some evidence."[34] At trial, "the accused must show facts which, if true, constitute [UCI], and that the alleged [UCI] has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings."[35] But "prejudice is not presumed until the defense produces evidence of proximate causation between the acts constituting [UCI] and the outcome of the court-martial."[36] "For an accused to be entitled to appellate action on his case, the unlawful influence must be the proximate cause of the unfairness of his court-martial."[37]

"Once the issue is raised at the trial level, the burden shifts to the Government, which may either show that there was no UCI or show that the UCI will not affect the proceedings."[38] The burden of disproving the existence of UCI or proving that it will not affect the proceeding does not shift until the defense meets the burden of production. If the defense meets that burden, a presumption of prejudice is created.[39] To overcome this presumption, a reviewing court must be convinced beyond a reasonable doubt that the UCI had no prejudicial effect on the court-martial.[40]

The military judge ruled that Appellee's loss of his IMC and ADC, both of whom had been on the case for over a year, demonstrated that the Government had not disproven any prejudicial effect of the alleged UCI. We disagree.

---

[32] *Barry*, 78 M.J. at 77 (internal citations omitted).

[33] *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (internal citations omitted).

[34] *United States v. Biagase*, 50 M.J. 143,150 (C.A.A.F. 1999).

[35] *Id.*

[36] *Id.*

[37] *United States v. Reynolds*, 40 M.J. 198, 202 (C.A.A.F. 1994).

[38] *Id.* (additional citation omitted).

[39] *United States v. Douglas*, 68 MJ 349, 354 (C.A.A.F. 2010) (citing *Biagase*, 50 M.J. at 150).

[40] *Id.*

## C. Excusal of Counsel

Appellee's loss of counsel is the central issue to all three of the Government's AOEs. First, by allowing Appellee to release his counsel before addressing the UCI motion, the military judge effectively precluded the Government from ever showing that the alleged UCI would not affect the proceedings. Second, the question of prejudicial effect on the proceedings is a critical factor in deciding whether actual UCI occurred. And, third, the causal connection between Col Sierra's comments and the release of counsel is key to answering whether apparent UCI existed. Thus, we focus our analysis on how and why Appellee's IMC and ADC were excused.

### 1. Waiver

In this analysis, we decline to apply waiver based on Appellee's consent to his counsel's release. "The Supreme Court has admonished . . . that courts should not lightly indulge the waiver of a right so fundamental as the right to counsel."[41] We believe this admonishment particularly apt when UCI is claimed as the cause of counsel's conflict of interest, and that conflict purportedly drives an accused's decision to release counsel. Here, although Appellee affirmatively consented to the release of his counsel, the record fails to establish that he did so voluntarily. Appellee, his CDC, and the military judge describe a "Hobson's choice" whereby Appellee had "no real choice." Given the nature of the right at stake and the conflicts in the military judge's findings of fact regarding consent, we do not consider the issue waived.

### 2. R.C.M. 506(c) Excusal and Withdrawal

"Whether a conflict of interest exists and what effect any conflict of interest has are questions that involve issues of both fact and law."[42] "In addressing such questions, this Court must accept findings of fact by the military judge

---

[41] *United States v. Cooper*, 78 M.J. 283, 288 (C.A.A.F. 2019) (Sparks, J., dissenting) (quoting *United States v. Catt*, 1 M.J. 41, 47 (C.M.A. 1975) (citing *Glasser v. United States*, 315 U.S. 60 (1942))).

[42] *United States v. Watkins*, 80 M.J. 253, 263 (C.A.A.F. 2020) (Maggs, J., dissenting) (citing *United States v. Best*, 61 M.J. 376, 381 (C.A.A.F. 2005)).

unless they are clearly erroneous."[43] We review the military judge's conclusions of law de novo.[44]

At first blush, it appears the military judge resolved IMC's and ADC's requests to be released by relying on "the express consent of the accused" provision of R.C.M. 506(c). His extensive questioning of Appellee supports this. But, in his ruling on the Defense Motion to Dismiss, he referred to "an intolerable tension and conflict between [Appellee] and his specifically requested military counsel."[45] He further stated that, "[Appellee] was not really presented with a choice when his counsel sought to withdraw."[46] Rather than resolve the issue under either of R.C.M. 506(c)'s two alternative bases, he created a novel third: *it was consensual, but not really.* In doing so, the military judge never performed the "good cause" analysis contemplated by R.C.M. 506(c).

From R.C.M. 505(f):

> *"Good cause.* For purposes of this rule, 'good cause' includes physical disability, military exigency, and other extraordinary circumstances which render the member, counsel, or military judge or military magistrate unable to proceed with the court-martial within a reasonable time. 'Good cause' does not include temporary inconveniences which are incident to normal conditions of military life."[47]

While "conflict of interest" is not specifically listed, we consider it an "extraordinary circumstance" contemplated by the Rule. Thus, to determine whether there was good cause to excuse the counsel, we examine whether Appellee's IMC and ADC did, in fact, have a conflict of interest—and whether any such conflict was caused by the alleged UCI.

---

[43] *Id.*

[44] *United States v. Sullivan*, 42 M.J. 360, 363 (C.A.A.F. 1995).

[45] App. Ex. CIX at 11.

[46] *Id.* at 19.

[47] Given the similarity in scope—R.C.M. 505 deals with changes to counsel, R.C.M. 506 addresses excusal and withdrawal of counsel—and the shared use of the term "good cause," we find the former Rule's definition useful in interpreting the latter.

### 3. Any conflict of interest was purely subjective

The military judge states that he kept "com[ing] back to the same question: whether or not Col [Sierra's] comments are true or not [sic], how is a young officer like Capt [Tango] in a position to evaluate the truth of Col [Sierra's] statements?"[48] Yet, having repeatedly confronted the question, the military judge failed to recognize the possible answers. Capt Tango and Capt Romeo could have examined the copious, objective evidence provided by trial counsel refuting Col Sierra's comments. The two counsel (who, while significantly junior to Col Sierra, are licensed attorneys and officers of Marines) effectively took the position that: the clear statements of the Marine Corps' top judge advocate (a major general) and experts in the personnel law field; the immediate, permanent removal of Col Sierra from any role effecting promotions or detailing; the fact that seven of the last eight SJAs to the CMC had served as defense counsel at some time in their careers; and that, despite his current role as a defense counsel, Capt Tango had been selected for highly-coveted follow-on orders, were not sufficient to sway their belief in the truth of Col Sierra's comments.

The two attorneys also could have consulted with their leadership. The views of more experienced, senior judge advocates could have alleviated any impact of the two captains' relative inexperience. Both IMC and ADC stated they had spoken with a supervising attorney. (Unfortunately, it appears that the SDC did little but stoke the fires fueling the two defense counsel's belief that their careers were at risk.[49] We ascribe the diminished value of this potential resource not to any Government action, but to the SDC.)

Both counsel told the military judge that they had consulted their respective state licensing authorities. While the military judge assigned great weight to this, the record is bereft of any evidence as to what that consultation involved, either as to how the counsel described the situation or as to the advice received.

From the evidence in the record, we conclude that Capt Tango's and Capt Romeo's conflicts were purely subjective. "A purely subjective conflict is . . . an attorney's individual shortcoming, flowing from an incorrect assessment of the situation . . . . Purely subjective conflicts are, in fact, no more than a polite way

---

[48] App. Ex. CIX at 14.

[49] See LXXXVI at 69-75 (SDC's affidavit).

of saying personal mistakes."[50] While "a lawyer's mistake about the existence of a conflict could provide good cause if the mistake would adversely affect the attorney's representation,"[51] such a "personal mistake" by counsel is not the fault of the Government. And, therefore, it does not merit a remedy at the Government's expense—certainly not the most drastic remedy available.

### 4. UCI Was Not the Proximate Cause of Counsel Excusal

By handling Appellee's counsel's requests to be excused prior to and independent of the UCI claim, the military judge rendered his ultimate ruling a fait accompli. He accepted Appellee's consent to release his counsel, then, citing Appellee's loss of counsel,[52] concluded that the Government had not proven beyond a reasonable doubt that UCI did not affect the proceedings. By not first critically examining the claimed conflict of interest or purported causal link between Col Sierra's comments and the excusal of counsel, the military judge effectively ceded to Appellee the power to rule on his own motion. *I have released my counsel; the harm has been done. How could the Government possibly prove there would be no effect on the proceedings?*

Later, in his written ruling on the motion to dismiss, the military judge found that "the actions of the Government have materially prejudiced [Appellee's] right to an IMC and his right to detailed counsel."[53] As the evidence (of both the Government's curative actions and the demonstrably false nature of Col Sierra's comments) shows that the loss of counsel was not caused by the alleged UCI, we find this to be clear error. While Col Sierra's clearly improper comments began the chain of events leading to the excusal of Appellee's counsel, they were not its proximate cause. Rather, it was the IMC's and ADC's mistaken belief that they faced a choice between their careers and zealously representing their client.

We are convinced beyond a reasonable doubt that Col Sierra's comments and actions at the 18 November 2021 DSO meeting did not cause counsel to be excused. And we are similarly convinced that his comments will not otherwise

---

[50] *Watkins*, 80 M.J. 253, 264 (Maggs, J., dissenting) *(*quoting *Tueros v. Greiner*, 343 F.3d 587, 595 (2d Cir. 2003)).

[51] *Watkins*, 80 M.J. 253, 264 (Maggs, J., dissenting).

[52] The military judge noted that, in rebuttal of the Government's claim that the alleged UCI will not affect the proceedings, "the Defense, in essence, simply points at its table: Three attorneys once sat, and then there was one." App. Ex. CIX at 15.

[53] App. Ex. CIX at 17.

affect the proceedings. As the Government has met its burden on this point, the military judge erred in finding actual UCI and imposing a remedy therefor.

## II. CONCLUSION

After careful consideration of the record and the briefs and arguments of appellate counsel, we have determined that the military judge abused his discretion in dismissing with prejudice the charges in this case.

Accordingly, the 9 February 2022 ruling of the military judge is **VACATED** and the case is **REMANDED** for further proceedings not inconsistent with this opinion.

FOR THE COURT:

S. TAYLOR JOHNSTON
Interim Clerk of Court